The plaintiff alleged that in attempting to cross defendant's railroad at the crossing at Fifth Street, in Charlotte, with her horse and (722) buggy, she was carelessly and negligently run into by defendant's shifting engine, and that she was injured in her person and property — her buggy broken, her horse frightened and thereby rendered less easily manageable, and her shoulder bruised, causing a permanent injury to her right arm, and claimed $1,900 damages.
Defendant denied that plaintiff's injuries were caused by its engine, and charged plaintiff with a failure to exercise ordinary care in attempting to make the crossing.
The following issues were submitted:
1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint?
2. Did the plaintiff contribute to her injury by her own negligence?
3. What damage did plaintiff sustain?
Plaintiff's counsel agreed, after the pleadings were read, that she was entitled to compensatory damages only.
Plaintiff in her own behalf testified that she was a regularly licensed physician, engaged in the practice of her profession. "On 17 April, 1891, on my way to visit a patient, I attempted to cross defendant's railroad at the Fifth Street crossing; it was about 5 p. m. I was driving my horse and buggy, and had in the buggy with me a colored boy, 8 or 10 years old. Before crossing track, I pulled up my horse to hear if there was any approaching train. There were box cars on one of the tracks on both sides of the street — this was on the first track — and an engine standing to the left; these were all stationary. I heard no bell *Page 479 
ring. I did not see the engine that struck me until it was within a few feet of me. The engine was running backward towards Trade Street, which was the next street to my left as I crossed; it was pushing the tender, and it was the tender which struck my buggy. I was sitting on the right side of the buggy. The buggy was struck; (723) one wheel was broken and the other wheel ruined. The horse fell, but soon got up and ran. I was thrown first up against the side of the buggy, striking my shoulder against one of the upright pieces, or bows, which hold up the top of the buggy; I then fell down into the foot of the buggy. I held on to the lines and stopped the horse in some 50 or 75 feet. The fall against the top bruised my right arm, near the shoulder, and the fall into the front bruised my left side slightly. My arm was hurt. I did not feel the pain for half an hour; then I felt pain in my shoulder. I went on from the place where the buggy was stricken, to visit my patient, a sick child. When I got home I had a nervous shock. There was a dull, aching pain in my shoulder, which has continued ever since. The railroad is accustomed to ring the bell at the crossings."
On cross-examination she testified: "I do not say I came to a full stop; I held up very slow. I had crossed there the evening before and that morning. Fifth Street is open beyond this crossing. This was the railroad yard. There were several tracks there. I was familiar with the Trade Street crossing. There are gates there, which are lowered when there is danger and raised when there is none. Oates' factory is on one side and Wilkes' foundry and machine shop on the other side of Fifth Street at this crossing. Both the factory and foundry were running and making a noise. I heard the bell at the same place the evening before, when the factory and foundry were both running. Dr. Meisenheimer and my father, who is also a physician, were called in that same evening and examined me. I have been examined, since I brought suit, by Drs. Meisenheimer, Graham, and Brevard — once last February and once a week or so ago, by Drs. Meisenheimer and Brevard. Dr. Graham was out of the city the last time. They examined me for the purpose of ascertaining the extent of my present condition, so as to (724) be able to testify. I went to see my patient immediately. I have not been kept in the house and never carried my arm in a sling. I did not stop from my profession; used my arm as little as possible. I drive the same horse yet — drive with my right hand, the one that was hurt."
One Bostwick, witness for the plaintiff, testified: "I was sitting in my door; could see the crossing from it; saw Dr. Alexander rein up as if to look and listen; then she drove across. I did not hear any bell or warning given by the engine. There is a slight up-grade from a point *Page 480 
above, 100 yards up the track to Fifth Street. The engine was rolling slowly, without steam up, to within a few yards of the crossing, and then steam was put on and the speed increased to 6 or 8 miles an hour. I examined the place a short time afterwards. She could not have seen the approaching engine."
Dr. J. B. Alexander, for plaintiff: "I am a physician; am in the drug business. The plaintiff is my daughter. I did not see my daughter, the plaintiff, until I got home. Her arm was bruised and discolored. I sent for Dr. Meisenheimer. We could not tell much about the injury. It has gradually grown worse. The action of the arm is greatly impaired; the shoulder is lower than the other; the shoulder-blade is dislocated, and there is a slight curvature of the spine. All of it is the result of the blow — at least, I know of no other cause."
Dr. Meisenheimer, for plaintiff, testified: "I examined the arm that day, or the next, and found it blue from the blow — discolored on outside. I found no crepitation. She complained of pain. I saw the arm again last February, with Drs. Graham and Brevard. I found crepitation then — a creaking sound. I examined it again a short time ago, and found the crepitation increased — the shoulder-blade drawn (725) around one inch further than the other. I think the injury was caused by the blow. In my opinion, it will be a permanent injury."
On cross-examination witness stated: "The scapula, or shoulder-blade, is drawn around by contracting muscles. I do not think driving could pull the shoulder-blade around. I think probably it will be permanent. I do not think there was a rupture of the ligament. It is possible it might have been overlooked. Rest is good for all joint troubles; it is the proper treatment."
Dr. Brevard, for plaintiff, testified: "I examined plaintiff's arm last spring, with Drs. Meisenheimer and Graham; found crepitation in shoulder joint; some depression of the shoulder. I am inclined to think the injury is permanent. The bone has been jammed into the socket and injured. On second examination, a short time ago, with same doctors, I found the scapula moved forward about one inch. The injury was from the blow on the shoulder. It would lessen the strength of the arm and render it less able to bear continued exertion, and is a great injury to a physician. Rest is the proper treatment for injury to joints. It would have been better to have kept it in a sling. Any exertion of that arm and the muscles would tire and irritate the injured part. Driving would be bad for it. Rest is the proper treatment of injured joints, so far as I know. I should prescribe rest for it now."
Plaintiff then introduced the town ordinance limiting the speed of engines running through the city to 4 miles and requiring them to ring bell at crossings, and prohibiting the blowing of the whistle.
Plaintiff rested. *Page 481 
Defendant offered J. W. Keeter, who swore that he was running the engine; that he was what is known as a "hostler" in the yard of defendant; that he was running 5 or 6 miles an hour and not ringing the bell because the bell rope was on the fireman's side and he (726) could not reach it; that his helper, or fireman, was riding in front, on the tender; was there for the purpose of changing the switch just below Fifth Street, so as to let the engine go over without injury, and to look out for people on the track or attempting to cross it; that he had been letting his engine roll, so as to stop at Fifth Street and allow the helper to get down and change the switch, but just before reaching Fifth Street he discovered that the switch had been changed by some one and was in proper condition to let him through; that the engine did not have way enough on it — was not running fast enough to carry him over the street, and he had just reached up to put on steam when he saw the buggy; could not say whether he put on any steam or not; did everything he could to stop when he saw the buggy, only a few feet from the tender, but could not, and rolled on some 20 or 30 feet across the street. The helper, Nelson, got off immediately and went to plaintiff, but witness could not go at once, until he could secure his engine, which was on the main line. As soon as he could do this, he saw from the fireman's window that plaintiff was leaving. There are four tracks across the street there. In going in the direction the plaintiff was traveling, the first track you crossed was the Oates spur track — no cars on it; the next was a side track, called the factory track; on this track there were box cars, standing on the right side of the street, and an engine standing, headed toward the street on the left side. I was running on the next track, which is the main line, and beyond me was the fourth track — a side track, known as the cemetery track."
In proper time, and in writing, the defendant asked special instructions, some of which were refused and some were given in the very words of the prayer. Some were refused and not given in the very words asked for, but were given as the opinion of the court (727) in the general instructions given in the written charge.
The first prayer was given, and no exception is made to that.
The second prayer was: "If the plaintiff, by the exercise of her senses, could have heard the approaching engine, and failed to do so, and her injury was caused thereby, it was negligence on her part, and the answer to the second prayer should be `Yes.'" The court, being of opinion that defendant had no right to have the legal proposition embraced in the prayer, gave the instruction asked for, down to and including the words, "negligence on her part," and refused to add the remaining words, "and your answer to the second issue should be `Yes.'" *Page 482 
Defendant excepted, because the whole prayer was not given, because the words were omitted, "and your answer to the second issue should be `Yes.'"
The third prayer was: "The defendant had a right to leave its cars on its side track, and if this was the cause of the injury, the answer to the first issue should be `No.'"
The court refused to give the instruction thus asked for, and said defendant had the right to use its track across the public highway and to leave its cars standing on the track, provided it kept open a sufficient passway.
To this the defendant excepted.
The court, in answer to the prayer of defendant for instruction No. 1, had given, in the words of the request, this instruction: "The burden is on the plaintiff to show that the negligence of the defendant was the proximate cause of her injury, and unless she shows this by a preponderance of the evidence, the answer to the first issue should be `No.'"
The fourth prayer for instruction is as follows: "The fast (728) running of the defendant's engine, and its failure to ring the bell, and any other negligence it may have been guilty of, did not relieve the plaintiff from taking the ordinary precaution for her own safety, and if her negligence was the proximate cause of her injury, the answer to the second prayer should be `Yes.'"
This instruction was not given entirely as asked for, but it was given down to and including "the proximate cause of her injury," and the court added, "she can recover," and omitted the words, "the answer to the second prayer should be `Yes.'"
To this defendant excepted.
The fifth instruction asked for was: "If plaintiff heard, or could by reasonable diligence have heard, the approaching train, and attempted to cross before it reached the crossing, and her injury was the result of her miscalculation, the answer to the second prayer should be `Yes.'"
This prayer was given, as prayed for, down to and including the word "miscalculation," and the court added, "she could not recover," and declined to give "the answer to the second issue should be `Yes.'"
To this the defendant excepted.
The sixth instruction asked for was: "If the cars on the track cut off the plaintiff's vision, and the noise of the factory and machine shop drowned other noises, it was the duty of the plaintiff to use her sense of hearing all the more cautiously, and if she failed to use greater than ordinary caution, the answer to the second issue should be `Yes.'"
The court gave the instruction asked for, in the very words, down to and including the word "caution," and added, "it would be negligence," and refused to give the words, "the answer to the second issue should be `Yes.'" *Page 483 
And to this the defendant excepted. (729)
The seventh instruction asked for was as follows: "Under the circumstances of this case, as shown by the evidence, it was the duty of the plaintiff to get out of her buggy and go to a point past the cars on the side track, where she could see up and down the tracks, and if she failed to do this, and such failure was the cause of her injury, the answer to the second issue should be `Yes.'"
This was refused, and defendant excepted.
The defendant asked for instruction numbered 7a, as follows: "Under the circumstances of this case, as shown by the evidence, it was the duty of the plaintiff to stop, to look and listen, and if she failed to do so, and her injury was caused thereby, this was contributory negligence, and the answer to the second issue should be `Yes.'"
The court, being of opinion that this had been in substance already given, refused it.
And to this the defendant excepted.
The defendant asked for instruction numbered 8, as follows: "The fact that the plaintiff is a woman makes no difference. The degree of care she was required to use was that which a man should have used, and if a man in the possession of his senses could, in her situation, have avoided the accident by the use of reasonable care, the answer to the second issue should be `Yes.'"
The court had instructed the jury: "It makes no difference, in applying the law, that the plaintiff is a woman. She is under, in respect to this case, the same rules as a man."
The court refused the instruction in the words of the prayer, and defendant excepted.
The ninth instruction asked for was in these words: "If a man in possession of his senses could, by reasonable care, have heard or seen the approaching engine, the plaintiff is presumed to have (730) seen or heard it."
The tenth prayer was as follows: "The evidence shows that plaintiff's injury was caused by her own negligence, and the answer to the second issue should be `Yes.'"
Both the foregoing prayers were refused, and the defendant excepted.
The defendant asked for instruction 10a, as follows: "It was the duty of the plaintiff to use the proper means for her recovery from any injury she sustained by the accident, and if she failed to do so she can only recover for such injury, loss of time and medical bills as would reasonably flow from the injury with proper treatment."
This prayer was refused in the words asked, and the court in response gave the instructions set out in the charge, and to this defendant excepted. *Page 484 
The defendant further asked instruction No. 11, as follows: "Plaintiff cannot recover anything on account of any increased damages or injury to herself caused by her own neglect and failure not to adopt a reasonably proper treatment of herself." (His Honor states: "My recollection is that the charge was given. I find on examining the prayers presented by the defendant that I marked on the margin opposite each prayer `Given' if I intended to give, and `Refused' if not to be given. I did not make any mark on the margin opposite this prayer.")
No. 12 prayer for instruction was: "If the jury believe the evidence of the plaintiff herself, she did not use reasonable care in crossing the railroad, and thereby contributed by her own negligence to her injury, and the answer to the second issue should be `Yes.'"
No. 13 prayer was as follows: "If the jury believe the evidence, plaintiff did not use the proper means for restoring herself to health, and she can therefore recover nothing for any injury caused by her own neglect."
(731) Both the foregoing prayers were refused, and the defendant excepted.
The jury found all the issues in favor of the plaintiff, and assessed damages $1,500, and, after refusing motions to set aside the verdict as being against the weight of the evidence and as awarding excessive damages, and for a new trial, the court gave judgment for the plaintiff, and defendant appealed.
It was admitted on the trial that the defendant had been negligent. The contention was principally upon the second issue, which involved the question of contributory negligence. As stated in defendant's brief, "The only question, then, is, Were the instructions warranted by the evidence, and, if so, were they substantially given in the charge?" There seems to be no error in the charge, unless there was a failure on the part of his Honor to give some instruction which defendant requested and to which it was entitled. We will, therefore, examine the prayers for instruction, with the responses and exceptions thereto, in connection with the general charge.
The second prayer was given, with the exception of the last clause thereof, which was, "and the answer to the second prayer (evidently meaningissue) should be `Yes.'" We do not appreciate the reasons of his Honor for refusing to give this portion of the instruction, as it was the corollary of the proposition laid down, and was entirely proper to have been given. But we must presume that the jury were intelligent *Page 485 
enough to understand plain language. The question was, (732) the plaintiff contributed to the injury by her own negligence. The instruction was, "If the plaintiff, by the exercise of her senses, could have heard the approaching engine, and failed to do so, and her injury was caused thereby, it was negligence on her part." While it was proper to add the conclusion asked for, it was not necessary, as to the mind of any man of ordinary comprehension it followed as of course. We cannot see that the failure to give it was calculated to mislead the jury or in any manner prejudice the defendant.
The sixth prayer for instruction was responded to in the same manner, the concluding portion being omitted and the words "it would be negligence" substituted. And what we have said with regard to the response to the second prayer will apply with equal force to the sixth. In the same connection we will consider the fourth and fifth prayers, with the responses thereto of his Honor. The instructions were given in the words of the prayers, except as to the conclusions, "that the answer to the second issue should be `Yes,'" for which his Honor substituted the words "she cannot recover." It is true that this Court has repeatedly held that it is not error in the trial judge to refuse an instruction upon an issue directed to the ascertainment of a fact, that in a certain event the plaintiff is not entitled to recover. McDonald v. Carson,94 N.C. 497; Farrell v. R. R., 102 N.C. 390; Baker v. Brem, 103 N.C. 72. We reiterate the expressions heretofore used upon this subject, but it by no means follows, when the instruction has been given in the words of the prayer upon the facts involved, that because the conclusion is in this objectionable form, there is such error as will entitle the defendant to a new trial. There is no complication in this case which would make it likely that the jury could be confused by this instruction. It could bear no other construction than that if they found the facts as stated, there was contributory negligence on the part of the plaintiff. The instruction as requested is in the approved formula, but (733) unless the jury have been misled, or it was calculated to mislead them, no harm could have come to defendant. We cannot see how any intelligent mind could hesitate in reaching a right understanding of the charge in this respect.
We consider the instruction given in answer to the third prayer as fully as strong as the defendant was entitled to. It was in evidence that the accident occurred at the crossing of a public highway. It may be questionable whether the defendant had the right to leave its cars, except for necessary delays in crossing, upon it at all. Certainly it was its duty to have left open a sufficient passway for the public. Harrell v. R. R.,110 N.C. 215. *Page 486 
It is contended, under prayers No. 7 and No. 7a, that the duty of the plaintiff, under the circumstances of this case, was to have got out of the buggy and gone to a point beyond the cars on the side track, where she could have seen up and down the track, or at least to have stopped to look and listen for an approaching engine or train.
His Honor announced the general principle in that part of his charge which immediately precedes the first exception, and in that part which is covered by the first and second exceptions applied it to this case. The general principle was that she had the right to use the public street across the railroad track of defendant, but she did not have the right to carelessly undertake to pass immediately before a moving engine, if she could, by taking reasonable precaution, have known of its approach. The application seems to have been fairly made. Although no testimony is reported to us that would warrant the inquiry whether she was motioned to by the helper on the engine and told to hold up, yet the whole of that part of the charge just referred to was full and presented the questions of negligence or care, and we see nothing in it of (734) which the defendant can justly complain. We cannot hold with the defendant that it was necessary for the plaintiff to do more than to check up slowly and look and listen, and endeavor to ascertain whether there was an approaching engine. The public knew — the ordinance required — that the approach of an engine should be heralded by the signal of the bell. According to the testimony of defendant's witness, this necessary precaution was omitted. And if the plaintiff's testimony was believed, she did "hold up slow," and, hearing no bell, which she had heard on the evening previous, notwithstanding the noise of the machinery on each side of her, concluded there was no engine approaching, and drove on. Hinkle v. R. R., 109 N.C. 472.
The eighth prayer was not given in full, but that portion which was not given had already in substance been given in the instructions in response to the second prayer. Where the instruction has once been given it is not ordinarily incumbent upon the judge to repeat it; and there is scarcely a volume of our Reports in the past ten years which has not declared that the instruction need not be in the words of the prayer if there is a substantial compliance therewith.
The ninth prayer was a general proposition which was fully covered in the instructions given. The tenth and twelfth were properly refused, and the issue as to contributory negligence left to the jury.
If we take it that the eleventh prayer was not given, his Honor not being able to say distinctly from his notes or recollection that it was given, we do not think the defendant had cause of complaint, for his Honor had already instructed the jury as to the duty of the plaintiff to use reasonable and proper care for her recovery in such manner as to *Page 487 
indicate that unless such care was taken, the plaintiff could (735) not recover at all, thus going further than the defendant asked. And this applies to the prayer marked "10a."
Upon the thirteenth and last prayer the testimony was that the plaintiff was herself a practicing physician; that she did not feel the pain until about half an hour after the accident; that she went on to see her patient, and when she got home she had a nervous shock, and her father, who was also a physician, and Dr. Meisenheimer were called in the same evening; that she had not been kept in the house nor had she carried her arm in a sling; that she continued to practice her profession and to drive with her right hand, the one that was hurt. It was also in evidence that it would have been proper treatment for her to have carried her arm in a sling and to have rested. There was also evidence as to the character of the injury.
We think his Honor properly left the question to the jury under appropriate instructions, and when we advert to that part of the charge which bore upon this point, and which we think was warranted by the testimony we think it was not error to refuse the thirteenth prayer. Patterson's Ry. Accident Law, sec. 397.
Upon the whole, we conclude that the case has been fairly and intelligently tried; that the failure to give the conclusions asked in several prayers and the phrases substituted therefor, while in those in which his Honor used the words "she cannot recover" it is objectionable, were not calculated to and did not prejudice defendant's case.
We do not deem it necessary to cite the very numerous authorities on the subject of contributory negligence, ever increasing in volume. The general doctrine is so well established that the only labor is in the application thereof to the case presented.
NO ERROR.
Cited: Tankard v. R. R., 117 N.C. 562; Russell v. R. R., 118 N.C. 1109;Mesic v. R. R., 120 N.C. 491; Norton v. R. R., 122 N.C. 934, 936;Cooper v. R. R., 140 N.C. 219, 227; Inman v. R. R., 149 N.C. 127;Osborn v. R. R., 160 N.C. 312; Johnson v. R. R., 163 N.C. 447; Shepardv. R. R., 166 N.C. 545; Brown v. R. R., 171 N.C. 270; Dunn v. R. R.,174 N.C. 260; Perry v. R. R., 180 N.C. 296. *Page 488 
(736)