The plaintiff alleged that on or about 1 September, 1910, he, a boy of about 12 years of age, was attempting to cross the track of the defendant railroad on Elm Street in Maxton, N.C. at a public crossing. That the defendant was engaged in making what is known as a flying switch, and that it negligently ran over the plaintiff as he was crossing the defendant's tracks on said street; that his foot was injured by being run over, and that he was damaged in the sum of $20,000. The specifications of negligence in the complaint are as follows:
1. The train of the defendant was operated in a negligent and careless manner and at an unlawful rate of speed.
2. Defendant had no one on the car, which struck the plaintiff, to control its movements.
3. No lookout was kept on the car.
4. No warning or signal whatsoever was given of its movements or approach, and defendant was making what is known as a flying switch.
5. That the street is constantly used by the public in passing and repassing over the defendant's tracks from one side to the (435) other, and defendant permitted a string of cars to remain standing on one of its tracks, and they so obstructed the view of plaintiff, as he approached the tracks on his bicycle, that he could not see the loose cars, as they moved toward the crossing, after being detached from the train.
The defendant answered, denying all the allegations of negligence, and alleged that plaintiff was guilty of negligence, in that he was coming down Elm Street on a bicycle and crossed defendant's track, after being warned not to do so, and instead of keeping on the street, where there was no danger, he suddenly turned his wheel or bicycle, and running parallel with the said track, he fell under the moving train, and this was the sole cause of his injury. *Page 350 
Much evidence was introduced by the parties to sustain their respective contentions. There was evidence tending to prove the following facts: The Seaboard Air Line Railway at the crossing consists of a main line and a side-track, which side-track branches off west of the crossing and enters, at some distance, the cotton oil mill yard, this part of the track being known as the oil mill siding, and lying on the north side of the main track, next Robert Croom's residence. A "pass track" connects the main line with the side-track, leaving the main line just west of the crossing and merging with the side-track upon and east of the crossing. All the tracks at one point on the crossing are only 19 feet across. Elm Street at this place is a much used thoroughfare, one of the principal residential streets, all three of the principal churches being on it and near this place. It is much used by children going to the graded school, about 200 yards away on this street, cotton oil mill employees, and citizens generally.
The witness for the plaintiff, as well as the plaintiff himself, testified that the view of the pass track mentioned above, and of the main track west of Elm Street, was entirely obscured by a line of standing cars on the oil mill siding, coming almost down to the street. The defendant's witnesses stated that they were making a "running switch," but that the loose car had upon it the conductor and a flagman. The evidence of the plaintiff, and of some of the plaintiff's witnesses, is that (436) there was no person on the car, and no warning was given of its approach. There is no evidence that any sufficient warning, was given at this time. The defendant, however, relied upon a warning, which its evidence tended to show had been given the plaintiff when the train first arrived at Maxton, and was then some 500 or 600 feet west of the crossing, and standing still, to "Stop; we are going to make a switch," after which, so the witness testified, he walked back some 200 feet and turned the train into the switch. Plaintiff testified that the negro was not at the crossing at all.
The witness McNeil, who made the map, testified that he did not know the width of the street; its edge was not well defined; he did not measure the distance between the south edge of the oil mill track and the north edge of the "pass track" on the west side of the street; but he used the map to illustrate his evidence as to measurements he did make. He put some designs on the oil mill track at the direction of young Johnson to represent standing cars, but did not say that the number and the exact position were directed by him.
Plaintiff testified in part as follows: "I started to Strickland's store and went on the left-hand side as you go down street towards Wilmington, Strickland's store being on the opposite side of the railroad; was going after some groceries for my mother; was on a bicycle. I went out *Page 351 
the back yard, down a path to Elm Street, and went then in the usual way, starting to Strickland's store, and when I came to the Seaboard crossing at Elm Street near Mr. Robert Croom's residence, I found a train there, that was shifting and had blocked the crossing. I stopped for it to get out of the way. Stopped somewhere between Mr. Croom's house and the railroad. A colored woman was there, but I did not know her at that time. It was Eliza McIver. She was between me and the Seaboard track, and had a go-cart with a child in it and one by it. At the time I stopped there waiting for that track to clear, I noticed on that, oil mill siding some box cars."
Q. How near down to Elm Street did they come? A. They ran near about onto Elm Street, just enough to pass by. They were shifting and the train was running back and forth. I did not attempt (437) to cross the street until the engine cleared and went on towards the depot with some cars attached to it. When it went by, I looked and listened and started across.
Q. What did you look for? A. I looked for another train.
Q. Did you see another? A. No.
Q. What effect, if any, did these cars standing on the oil mill track have on your seeing it? A. It was between me and the loose cars. After the track was clear and the engine had gone down towards Maxton going east, I started across the tracks. Just as I got about across, I heard somebody holler, "Look out!" and I looked around and saw a car and I tried to get between the tracks, and by that time it struck me. I tried to get between the main line and the side-track to clear the cars so I would be safe.
Q. Could you tell which track that loose car was going to take, the main line or the siding? No, sir.
Q. If you had gotten between that main line and the sidetrack, would you have been clear, regardless of what it took? A. Yes; I could have gone down and beaten it to where it was going.
Q. What happened? A. The car struck me about that time and ran over me. I had not gotten quite clear of that side-track that the car came in on. No one was at the crossing except Eliza McIver. I could not see the cars on the main line because of those box cars and the cars that I saw were on the oil mill side-track. They were not blocking the street, but they were near about on the street. I did not see any loose cars on the main line west of Elm Street; I saw one down at the crossing at the oil mill. I saw no cars on the main line except that one down at the crossing. That crossing was about a block west of Elm Street and the other cars I saw were near about to Elm Street on the oil mill side-track. They ran near about up to Elm Street, but I cannot say exactly how close, and those cars stayed on the oil mill track until after *Page 352 
I passed over. When I started down Elm Street this colored woman, who was ahead of me, was about 10 feet from the track, and I was 10 or 15 feet behind her. I was riding a boy's bicycle and I was 12 (438) years old at that time. I remained where I was until I saw the engine go towards the depot. I then immediately got up on my bicycle and rode across, but not until after I looked both ways and listened for another train. I crossed the railroad about the middle of Elm Street and was stricken by the cars.
Q. Was any one on those loose cars? A. No. sir. After the car ran over me, I got up and started home, and I saw a man, who I took to be the flagman, coming towards the switch. When the flagman came, I asked him to carry me home. He did not do anything, but only stood and looked at me. Mrs. Croom came out there and asked him to carry me in her house, if he would not carry me home. He stood and looked at me and did not say anything. About that time Cleo Strickland came along, and I asked him to carry me home. He said, "All right; get up," and I got up in the wagon and he started on across and got to the next crossing. He started the nearest way, got to the nearest crossing, and there was a car on that crossing, and we stopped to let it pass, and the flagman came running down there and said they said carry me to the hospital. I think it was the flagman who said carry me to the hospital. Elm Street is used for all the school children going to school, people going to the Baptist, Methodist, and Presbyterian churches, and people use it to go to the college. It is one of the public thoroughfares of the town. The employees of the oil mill also cross there. They carried me to the hospital, operated on me, and put me to sleep. I had my foot smashed up, a hole cut in the back of my head, and a hole cut in my thigh.
Plaintiff then described his injuries more minutely, as follows: "My foot is perfectly useless, or near about so. I can't use it at all from the heel to the end of the toes. The foot is sensitive and I can't bear any weight on it at all. In walking, I put my weight on my heel. I suffered all the time. Sometimes I got a chance to sleep. This accident happened on Thursday about 10 o'clock and on Saturday following the Thursday, they dressed my foot again and found some gangrene in it. They cut the bone, cut all the flesh off of my foot, and cut two of my toes off. After that, when the doctor dressed it, he kept cutting (439) off some. He cut off the ball of my foot and scraped the bone. I stayed in the hospital six weeks. I was not under the influence of ether on Saturday when those parts were cut off my foot, and it hurt me so I just had to scream and holler, I could not help it. After I left the hospital I walked on crutches for over a year, and during that time I was not able to put my foot to the ground any. Have not been *Page 353 
able to use the forepart of my foot from the instep out, to amount to anything. Since then it pains me whenever I work any. If I stand up right smart, it hurts me. Can't lift any weight on that foot, and I lost a job because I could not life and stand on my foot. When the weather changes it feels like neuralgia. The leg of my injured foot is about one-half inch smaller than the other one. Prior to this injury I was carrying water for the oil mill and got 50 cents per day. I can read and write and figure some. I do not use tobacco in any form and do not drink. My health was pretty good prior to this injury."
The defendant offered evidence tending to show that the plaintiff was not injured as he had testified, but fell under the cars and was hurt, as set forth in the answer, and that he was injured by his own carelessness, and not by any negligence of the defendant; that he failed to look and listen when his sight and hearing were unobstructed. The usual four issues were submitted to the jury as to negligence, contributory negligence, the last clear chance, and damages, and the jury answered all of them (except the third, which was not answered) in favor of the plaintiff, assessing his damages at $10,000. The court charged the jury upon the law relating to negligence under the first three issues, and there was no exception thereto. Defendant has reserved these exceptions, which are the ones mentioned and argued in its brief:
1. Refusal of motion to nonsuit or to charge the jury "that, upon all the evidence, the plaintiff, Clarence Johnson, is guilty of contributory negligence."
2. Excluding the evidence of the witness C. C. Hatch, that he had measured other box cars and ascertained their size and dimensions, this with a view of showing by comparison of those cars with those at the crossing in question, upon the assumed similarity of the two, that cars on the main track could not have passed cars standing on the (440) siding in the position described, and as testified by plaintiff.
3. Plaintiff, on cross-examination of defendant's witness, Bonnie Helms, who was employed by it as brakeman, asked him if he came to Maxton on a railroad pass furnished by the defendant. The question and answer were admitted, and defendant excepted.
4. The court charged the jury on the issue of damages as follows, omitting immaterial parts: "Under this issue he is entitled to a reasonable compensation for such injury as you may find to have been negligently inflicted by the defendant which was the direct and necessary consequence of the injury so negligently inflicted; a reasonable compensation for any and all pain which he may have suffered or may hereafter suffer; for all diminution of his power to earn money — his diminished earning capacity, as the books put it. Plaintiff contends that he cannot now perform, and that he will never be able to perform, work that men *Page 354 
usually do in attempting to make a living. He has introduced the mortuary tables that show his expectancy of life is 47 years; and they have made some figures about how much he would earn during that length of time. You are to consider what he was earning when he was hurt, and you may consider the mortuary table about how long he is likely to live; you may consider from what you find from this evidence what his earning capacity will be as he goes on, and then you will satisfy yourselves what would be the amount that he would lose from the earning capacity by reason of this injury to his foot. He is entitled to the difference between what he would make if the injury had not been done and what he would make with it done. You are not bound by the mortuary tables. You are not bound by the figures of the plaintiff or defendant as to any amount which you should give him in consequence of his diminished earning powers. Something was said by the defendant's counsel about $1,000 being a large verdict; but you are not bound by what he claims. You are not bound by what the defendant thinks he ought to have, or his counsel. It is a matter in your sound discretion. (441) You are to exercise your best judgment and your reason upon this evidence. If you reach this issue and say what is the value of his diminished earning capacity, then when you do that, you are to add reasonable compensation for his pain and suffering. In view of all the circumstances, consider this young man's condition in life and his probable future, as far as you can ascertain it, what is a reasonable compensation for the pain and suffering which he has undergone; and when you ascertain that, gentlemen, you add that to such amount as you may have determined to be the amount in which his earning capacity has been diminished by reason of the injury; put both amounts together, and that will be your verdict."
5. That the court refused defendant's motion to set aside the verdict, as being against the weight of the evidence, and the verdict as to damages, because they are excessive.
Judgment upon the verdict, and defendant appealed.
After stating the case: The defendant's motion for a nonsuit upon the evidence, and its request for a peremptory instruction to answer the issues in its favor, were both properly denied. The rule as to the treatment of the evidence upon such a question is not only very familiar, but has been stated in various ways so clearly and with so much repetition as to have become somewhat trite and even hackneyed. We *Page 355 
must again say that we are not at liberty to select those portions of the testimony more favorable to a defendant, in such a case, than the rest and act upon it for his special benefit. Such an imposing array of the evidence in his behalf would be not only one-sided, when we are required to hear both sides equally and fairly, but would manifestly be partial and unjust. The rule is rather the other way. We restated it concretely in the recent case of Osborne v. R. R., 160 N.C. 309, much like ours in its essential facts, thought not literally so. Some of the language then used will practically fit almost any case, and is surely applicable to the one at bar. We there said: "Defendant requested the court to (442) enter a judgment of nonsuit upon the evidence, as plaintiff's intestate was guilty of such contributory negligence in driving upon the crossing, without looking or listening, as barred his recovery. The judge could not have done so without deciding an issue of fact, which he is forbidden to do, that being the function of the jury. Pell's Revisal, sec. 535, and cases cited in note. The evidence favorable to defendant's view of the case may be ever so strong and persuasive, but if there is a conflict of testimony, it must be left to the jury, and they must find the facts. This is a case where there was a serious dispute as to the facts, which of course carried the case to the jury. It is our duty, upon a motion for a nonsuit, to consider the evidence in the view most favorable to the plaintiff, for at least one reason, which is, that the jury may adopt his version of the facts as the true one. It would be contrary to all our decisions to discard the proof in his favor and consider only that favorable to the defendant, or to permit the latter to overthrow the former, even if it is more reasonable and convincing. Such a course would contravene the express terms of the statute, and would nullify its plain and explicit injunction, that we, as judges, should confine ourselves to the law of the case and leave the finding of facts to the jury." See Brittain v.Westall, 135 N.C. 492; Deppe v. R. R., 152 N.C. 80; Hamilton v.Lumber Co., 156 N.C. 519. We would not hazard much, if anything, by stating broadly that Osborne's case, just cited, seems to cover this case as with a blanket, and we may refer to it later in order to show the striking similarity between the two.
As generally pertinent to the case in hand, we may formulate the following rules:
1. Where a railroad track crosses a public highway, both a traveler and the railroad have equal rights to cross; but the traveler must yield the right of way to the railroad company in the ordinary course of the latter's business, Duffy v. R. R., 144 N.C. 26.
2. While a train has the right of way at a crossing, it is the duty of the engineer to give signals and exercise vigilance in approaching such crossings. Coleman v. R. R., 153 N.C. 322. (443) *Page 356 
3. A railroad company and a traveler on a highway crossing are charged with a mutual duty of keeping a careful lookout for danger, and the degree of vigilance is in proportion to the known danger; the greater the danger, the greater the care required of both. R. R. v. Hansbrough, 107 Va. 733.
4. On reaching a railroad crossing, and before attempting to go upon the track, a traveler must use his sense of sight and of hearing to the best of his ability under the existing and surrounding circumstances — he must look and listen in both directions for approaching trains, if not prevented from doing so by the fault of the railroad company, and if he has time to do so; and this should be done before he has taken a position exposing him to peril or has come within the zone of danger, this being required so that his precaution may be effective. Cooper v. R. R.,140 N.C. 209; Coleman v. R. R., 153 N.C. 322; Wolfe v. R. R.,154 N.C. 569, in the last of which cases the rule was applied to an employee charged with the duty of watching a crossing and warning travelers of the approach of trains, and he was required to exercise due care, under the rule of the prudent man, for his own safety by looking and listening for coming trains.
5. The duty of the traveler arising under this rule is not always an absolute one, but may be so qualified by attendant circumstances as to require the issue as to his contributory negligence, by not taking proper measures for his safety, to be submitted to the jury. Sherrill v. R. R.,140 N.C. 255; Wolfe v. R. R., supra.
6. If he fails to exercise proper care within the rule stated, it is such negligence as will bar his recovery. Provided, always, it is the proximate cause of his injury. Cooper v. R. R., supra; Strickland v. R.R., 150 N.C. 7; Wolfe v. R. R., supra.
7. If his view is obstructed or his hearing an approaching train is prevented, and especially if this is done by the fault of the defendant, and the company's servants fail to warn him of its approach, and induced by this failure of duty, which has lulled him into security, he attempts to cross the track and is injured, having used his faculties as best (444) he could, under the circumstances, to ascertain if there is any danger ahead, negligence will not be imputed to him, but to the company, its failure to warn him being regarded as the proximate cause of any injury he received. Mesic v. R. R., 120 N.C. 490; Osborne v.R. R., supra.
8. If a traveler is without fault, or if his fault is either excused by some act of the company or is not the proximate cause of his injury, the company having the last clear chance, and if in attempting to cross track on a highway he is suddenly confronted by a peril, he may without the imputation of negligence adopt such means of extrication as are *Page 357 
apparently necessary, and is only held to such measure of care as a man of ordinary prudence would exercise in the same circumstances. Vallo v.Express Co., 14 L.R.A., 745; Lincoln v. Nichols, 20 L.R.A. 855;Crampton v. Ivie Bros., 124 N.C. 591, and especially Douglass v. R. R.,82 S.C. 71; 2 Elliott on Railroads (2 Ed.), sec. 1173.
With these general rules to guide us, the solution of the question presented will not be difficult.
This young boy rode up to the crossing on his bicycle and, as he testified, looked and listened for a train. He saw one pass, composed of an engine and box cars, the latter being shifted by the engine. He could not see to the west, because of box cars standing on one of the tracks, which obstructed his view. He did look to the east at the moving train, believing, and having good reason to believe, that it was coming back, and not suspecting that it had detached cars for the purpose of making a "flying switch." He did not and could not hear the noise of the loose cars as they came up to the crossing, for he could not see them through the solid intervening cars, and no warning was given of their approach, the first notice he had of them being the cry of a woman, which he heard at the very time he was stricken by the cars and knocked under them. He, therefore, had no chance to escape. There was no one on the loose cars to give him a signal to leave the track, and the cars on the adjoining track were so near the crossing as to render such a signal ineffective if it had been given. This is his version, and if accepted as true by the jury, it made out a perfect case for him. (445)
Defendant denied it, and alleged that he voluntarily rode between the cars in a negligent manner, not made very clear, and fell from his wheel under the cars and was crushed as he described. They allege that there was a man on the cars to warn those using the crossing, and that a proper and effective signal was given by him and the woman, which was disregarded.
In this conflict of views, the jury were the proper and only arbiters. They found for the plaintiff, and, as we must assume, under proper instructions from the court, as this part of the charge is not in the record, error not being presumed unless alleged and shown. This being so, the facts are as stated by the plaintiff, and he was, therefore, justly and legally entitled to the verdict. If we should nonsuit him or direct a verdict, it would be to reject all of his evidence in favor of that of defendant, which is out of the question. We must adopt his and reject the defendant's, except so far as the latter makes in his favor.
In this view of the facts, what are the legal questions involved and ultimate rights of the parties under them? This Court has recently declared, in Vaden v. R. R., 150 N.C. 700, that, "Making `flying switches' on the railway tracks and sidings running across and along the streets of *Page 358 
populous towns is per se gross negligence, and has been so declared by all courts in this country and by text-writers generally. It is stated in one of the best known text-books that the use of a running switch in a highway in the midst of a populous town or village is, of itself, `an act of gross and criminal negligence on the part of the company,'" citing Shearman and Redf. Neg. (3 Ed.), sec. 466; Wilson v. R. R., 142 N.C. 333; Allen v. R.R., 145 N.C. 214; Bradley v. R. R., 126 N.C. 742; Farris v. R. R.,151 N.C. 483; R. R. v. Smith, 18 L. R. S., 66, to which is appended a most valuable note upon this subject. In this respect, the Vaden case, and this one cannot possibly be distinguished.
So we see that defendant was "grossly" in fault at the very inception of this lamentable occurrence. It started wrong in the beginning and continued wrong throughout. It had set a death-trap for the passer-by and the plaintiff unwarily, but without fault, was caught in it, and came very near losing his young life. Will the railroads never stop (446) doing, in this respect, what the courts have so emphatically condemned as contrary to law and humanity? If plaintiff had been killed, upon the facts found by this jury, the person to blame for his death would have been guilty of manslaughter for his palpable negligence with full knowledge of its dangerous tendency. Not only did defendant make the dangerous "flying switch," but by its negligent conduct in concealing the moving of the detached cars, and by failing to give proper signals or warning to travelers using the crossing, it threw the plaintiff off his guard and enticed him into the trap.
The jury having repudiated the defendant's version of the facts and accepted the plaintiff's, there is no room left for the argument that the latter was guilty of contributory negligence, because they have found that he looked and listened and was prevented from any effective use of his faculties or his senses by the wrongful conduct of defendant in moving its cars rapidly without an engine, where they could not be seen, or the noise of their movement heard by plaintiff, and failing to give any warning of their approach. There is no logic that can withstand such an array of facts, and no law which justifies or excuses the defendant's conduct. It is like Wolfe's case, in that plaintiff's attention was riveted on the moving train that had just passed with every indication of its immediate return; and the resemblance does not end here, for Wolfe's view to the east was obstructed by cars standing on a side-track, just as plaintiff's view to the east was, in this case, obstructed by cars similarly situated. Wolfe v.R. R., 154 N.C. 569. While a greater degree of vigilance is required of a traveler than of an employee engaged in the performance of other duties for defendant, as in the instance of Wolfe, the principle underlying the two cases is essentially and broadly the same. *Page 359 
 Justice Manning said in Farris v. R. R., 151 N.C. 483: "While we are in no wise inclined to relieve the person crossing the tracks of a railroad from the imperative duty of observing the measure of caution so well established for his safety by the well considered decisions of this and other courts, yet it cannot always be said that he is guilty of contributory negligence, as a matter of law, because he did not continue to look and listen at all times continuously for (447) approaching trains, where he was misled by the company or his attention was rightfully directed to something else as well."
The crucial facts are that plaintiff did look and listen, and seems to have done the best he could under the circumstances. His suspicion was disarmed by the defendant's fault, and he did not, therefore, anticipate and danger in crossing at the time he did.
All this brings this case under the direct control of Osborne v. R. R.,160 N.C. 309, which is peculiarly analogous to it. We there said: "Applying these principles to the case, it will appear by a bare reading of the evidence that it should not have been withdrawn from the jury by granting a nonsuit. The jury, by their verdict, evidently found that the intestate and J. E. Puckett did look and listen, in the exercise of that degree of care characteristic of the man of ordinary prudence, and, further, that no signal from the approaching train was given. In Mesic v.R. R., 120 N.C. 490, after stating that it is the duty of a traveler on the highway, when he approaches a railroad crossing, to look and listen, even though the railroad may have been negligent, the Court says: `The rule, however, does not prevail where to look would be useless on account of obstructions, natural in themselves, or such as had been placed by accident or design by the company's employees on their tracks, and when at the same time, the engineer had failed to sound the whistle or ring the bell for the crossing, and in consequence of this failure the plaintiff had been induced to go upon the track and take the risk,'" citing Hinkle v. R.R., 109 N.C. 473; Alexander v. R. R., 112 N.C. 720; Russell v. R. R.,118 N.C. 1098; Norton v. R. R., 122 N.C. 910. See, also, Inman v. R.R., 149 N.C. 126; Morrow v. R. R., 146 N.C. 14; Norton v. R. R., supra, and Farris v. R. R., 151 N.C. 483.
Judge Elliott states the rule to be that "where the employees of a railroad company by negligent or wrongful acts mislead a traveler, and put him off his guard, the company may be liable, although the traveler may have done that which, but for the wrongful or negligent acts of the company, must have been considered negligence on his part." He adds that the traveler, though, must continue to exercise (448) ordinary care to avoid injury, according to the better reasoned decisions. But this is but another form of stating the general principle, that if the situation and surroundings are suggestive of danger, ordinary *Page 360 
care must be used to avoid it. If the traveler is deceived by appearances produced by the negligent act of the railroad employees, in such way and to the extent that a man of ordinary prudence would not anticipate danger, the company cannot take advantage of its own wrong and impute the blame to him so as to defeat his action.
The railroad company must abandon the device of the flying switch as a means of shifting its cars, which has been strongly condemned by us, as we have seen, or it must take the consequences of its causing injury to persons in the lawful use of its crossings, or at least, it must, by proper signals, whether from the top of the car or on the crossing, and by the exercise of that degree of care which is commensurate with the danger it has produced or enhanced, provide against resulting damage.
Maxton is a populous town, one of our largest and most prosperous, and this crossing is much used by the public, including school children. Common prudence demands that care, duly proportioned to the great risk they incur when they cross its tracks, should be taken in order that it will not be further increased by the continuance of unnecessary and highly dangerous methods in the operation of trains.
This case illustrates the danger of the "flying switch" and shows how easily it may entrap the unsuspecting traveler:
1. The following car was not coupled to an engine, which by its noise and smoke, its bell or whistle, would attract attention, and being much lighter, it moved almost noiselessly.
2. The engine with its cars had passed, making noise by ringing its bell and otherwise at the other end of the track, and by its movements indicating its return.
3. No one was at the crossing to signal that shifting was in progress.
4. The traveler relies upon the reasonable supposition that there is no danger ahead, and goes on, not anticipating that defendant, in violation of the law, would make a flying switch, especially under (449) such circumstances. 2 Thompson on Neg., secs. 1612, 1697 and note.
Add to all this the intervening line of cars which entirely obstruct his view and conceal the impending danger, and the trap is complete.
We do not impute any moral wrong to defendant, as we are dealing only with the legal aspect of the case; but the defendant was negligent to the point of recklessness, even if its acts were thoughtlessly and not intentionally committed.
The second exception is clearly untenable. It was irrelevant to the controversy that the witness C. C. Hatch had measured other box cars, unless it had been shown that the box cars near or at this crossing were of the same dimensions. It is admitted that there is no uniformity in the *Page 361 
width of box cars, and that those on the oil mill siding, which obstructed plaintiff's view, were not measured by the witness or any one else. The rule for estimating or judging one thing by its resemblance to another, therefore, does not apply, as at least substantial identity between them must first be shown before it is admissible to institute the comparison, so that you may reason from one to the other, for the purpose of proving the objective fact. This is so in regard to values, and is equally so as to size, quality, and quantity, or any other characteristic which admits of comparison. If the car at the crossing had been measured, no comparison would have been necessary. It is similitude that opens the door to this kind of evidence and lets it in. We have so held. Warren v. Mackeley,85 N.C. 12; Chaffin v. Manufacturing Co., 135 N.C. 95. Without this element, the evidence, if admitted, would be purely conjectural, and would introduce irrelevant and diverting matters, confusing to the jury and prolonging the trial indefinitely. Waters v. Roberts, 89 N.C. 145. We have assumed, for the sake of argument, that the question would otherwise be competent and relevant, which is by no means clear or to be taken as granted, and for that reason have left out of consideration other reasons assigned in support of the court's ruling.
Plaintiff was permitted to show, against defendant's objection, that Bonnie Helms, one of its witnesses and employed as its (450) brakeman, had come to the place of trial on a free pass, given to him by defendant. The purpose was to show his bias. Wigmore says in his work on Evidence (vol. 2, sec. 949): "The range of external circumstances from which probable bias may be inferred is infinite. Too much refinement in analyzing their probable effect is out of place. Accurate, concrete rules are almost impossible to formulate, and, where possible, are usually undesirable. In general, these circumstances should have some clearly apparent force, as tested by experience of human nature, or, as it is usually put, they should not be too remote. The relation of employment, present or past, by one of the parties, is usually relevant." But the very point was squarely decided in R. R. v. Johnston,128 Ala. 283, where it is said: "A witness may be questioned on cross-examination about matters which tend to show bias or partiality towards the party by whom he is introduced; and in an action against a railroad company to recover damages it is permissible for the plaintiff, on cross-examination of witnesses introduced by the defendant, to show that they were furnished free transportation for their attendance on the trial, or that they were given the general privilege of riding on the defendant's road; such evidence having a tendency towards establishing a bias on the part of such witnesses." See 1 Greenleaf Ev. (16 Ed.), 450. Cecilv. Henderson, 119 N.C. 423, cited by counsel for defendant, is not applicable. The two questions are essentially different. *Page 362 
The defendant moved in the court below set aside the verdict because it is against the weight of the evidence and the damages are grossly excessive, and the motion was pressed in this Court with zeal by counsel; but we must deny it, as we are not authorized to try the facts or to revise the findings of the jury in a case like this; nor do we assent to the claim that the damages are grossly or "shockingly" excessive. We are not, therefore, at liberty to review the ruling against defendant on the motion, but must leave it as we find it, the final appeal in such cases being to the presiding judge, and we may add that there is nothing in the evidence to show that his discretion was not properly exercised; (451) nor are we willing to intimate that we would reverse if we had the power to review. The eminently just judge before whom the case was tried would not have hesitated to set aside the verdict if, upon fair consideration of the proof, it was right to do so. We have just said, at this term, in Pender v. Insurance Co., ante, 98: "There was some evidence, which was properly submitted to the jury, and the defendant having failed to have the verdict set aside by the judge below, because it was against the weight of the evidence, must abide by the result as final and beyond our control. We can review by appeal `any decision of the courts below upon any matter of law or legal inference,' but in jury trials, at least, our jurisdiction ends when that is done. We cannot review findings of fact in such cases. Const., Art. IV, sec. 8." See Benton v. R. R., 122 N.C. 1007, and cases therein cited.
We are of the opinion, though, that there was an error in the charge as to damages. The three clauses in the charge to which exceptions were specially reserved in the assignment of errors are these:
1. "He is entitled to the difference between what he would make if the injury had not been done and what he would make with it done."
2. "If you reach this issue, and say what is the value of his diminished earning capacity, then when you do that, you are to add reasonable compensation for his pain and suffering."
3. "He is entitled to the difference between what he would make if the injury had not been done and what he would make with it done"; and the following: "If you reach this issue, and say what is the value of his diminished earning capacity, then when you do that, you are to add compensation for his pain and suffering"; also the following: "and when you ascertain that, you add that to such amount as you may have determined to be the amount to which his earning capacity has been diminished by the injury." The same instruction was given in Fry v. R. R., 159 N.C. 357,362. It will be sufficient to sustain this exception that we refer to that case and what we there decided. We there said: "There was error in the following instruction as to damages: *Page 363 
`If you find that he has been permanently injured, and that such (452) injury partially incapacitates him to earn money, then he would be entitled to recover damages for partial incapacity, if you find the injury was caused by the negligence of the defendant. He would be entitled to recover the difference between what he is able to earn at the present time, and in the future, and what he would have been able to earn if the accident had not happened; and passing upon his expectancy, the mortuary table has been read to you, and you will bear that in mind in awarding damages, if you find that the plaintiff is entitled to recover anything.' In an action for injuries by negligence, such as this one, the plaintiff is only entitled to recover the reasonable present value of his diminished earning capacity in the future and not the difference between what he would be able to earn in the future but for such injury, and such sum as he would be able to earn in his present condition. R. R. v. Paschall, 41 Tex. Civ. App. 357. Where future payments for the loss of earning power are to be anticipated by the jury and capitalized in a verdict, the plaintiff is entitled only to their present worth. Goodhardt v. R. R., 177 Pa. St., 1. The damages to be awarded for a negligent personal injury resulting in a diminution of earning power is a sum equal to the present worth of such diminution, and not its aggregate for plaintiff's expectancy of life. O'Brien v. White,105 Me. 308. The rule, as we see, may be stated with varying phraseology, but it all carries the same idea, that the estimate should be based upon the present value of the difference between plaintiff's earning capacity, and not the total difference caused by the injury. The rule is supported by many authorities in this and other jurisdictions. Pickettv. R. R., 117 N.C. 616; Wilkinson v. Dunbar, 149 N.C. 20; Bentonv. R. R., 122 N.C. 1007; Watson v. R. R., 133 N.C. 188; R. R. v.Carroll, 184 Fed. Rep., 772; Fulsome v. Concord, 46 Vt. 135; Kenny v.Folkerts, 84 Mich. 616." In Pickett v. R. R., 117 N.C. 616, a similar instruction was held (opinion by Avery, J.) to be objectionable, because "it left the date which should be the basis of the calculation, to say the least, uncertain, if the language was not susceptible of the construction that the net income would be estimated as of the period when those dependent on him would have realized the benefit of his labor had he not come to an untimely end." It is there said that the jury (453) should be told that it is the present value of the net earnings or income, the rule being stated succinctly and clearly in the seventh headnote of the case. The identical rule is laid down in Benton v. R. R.,122 N.C. 1007 (opinion by Clark, J.), citing Pickett v. R. R., supra;Burton v. R. R., 82 N.C. 504; Kesler v. R. R., 66 N.C. 154. This is not merely the just and reasonable rule, where all the damages are to be awarded and paid presently, and not as they accrue in the future, *Page 364 
but it is the only one admissible under the statute, and it is said inBenton's case to have been established by the precedents. Any other principle, if adopted, would enable a plaintiff to recover more than could possibly be earned, as no man realizes at once the full earnings or accumulations of a lifetime.
There must be a new trial of the issue as to damages, and it is restricted to that issue, as was done in Tillett v. R. R., 115 N.C. 662;Pickett v. R. R., supra; the error relating only to the damages.
New trial.