A. B. MILLER v. NORTH CAROLINA RAILROAD COMPANY AND SOUTHERN RAILWAY COMPANY.

(Filed 7 January, 1942.)

**1. Railroads § 9—**

Where all the evidence tends to show that plaintiff started his car and drove a distance of eight or ten feet onto the crossing in front of an oncoming train, and that his view of the train was unobstructed for a distance of half a mile before it reached the crossing, the evidence discloses contributory negligence constituting a proximate cause of injury as a matter of law.

**2. Same—**

The existence of signs and poles along the right of way of a railroad company is immaterial when the evidence discloses that they did not obstruct plaintiff's vision from where his car was stopped before he entered upon the crossing.

**3. Same—**

The fact that automatic signals at a railroad grade crossing were not working at the time of the accident is immaterial on the issue of plaintiff's contributory negligence in entering onto the crossing in front of a train which he should have seen approaching when the evidence discloses that plaintiff knew the signals were not working and did not rely upon them, but looked in both directions before starting upon the crossing.

CLARKSON, J., dissenting.

APPEAL by defendants from *Bone, J.,* at February Term, 1941, of DAVIDSON.

Civil action to recover for personal injuries and property damage alleged to have been caused by the negligence of the defendant, Southern Railway Company.

The record discloses that on the morning of 20 March, 1940, the plaintiff's automobile collided with defendant's passenger train at "West End

Crossing," a paved, double-tracked, grade crossing in the town of Thomasville, and inflicted serious personal injuries on the plaintiff and demolished his automobile.

The plaintiff had driven from his home, a distance of about eleven miles, and was on his way to the plant of the Columbia Panel Company, where he worked. It was a little after 7:00 a.m. He says: "I had been using this crossing once or twice a day, five to six days a week for about six months, and was familiar with it."

As the plaintiff approached the crossing he observed that it was blocked by a freight train on the second or northbound track—the one farthest from him. He stopped about eight or ten feet from the first rail of the southbound track—the one nearest to him—and to the right and abreast of another car which had also stopped at the crossing. The automatic signals were not functioning that morning. Plaintiff stood there three or four minutes. Presently, the crew of the freight train cut it in two and pulled the front part up, clearing the crossing. A car and a truck came across from the opposite side. Plaintiff says, "as soon as the truck cleared the crossing and ceased to obstruct my view towards the depot, I looked to my left in the direction of the depot and listened, and I looked to my right and listened before starting. My engine stopped while I was parked at the intersection. I started my engine at the time the truck came over the tracks and came on by me. I put my car in low gear and did not change it. I did not see the moving passenger train which struck me. The front end of my car was across the first rail of the first track when it hit me. The front wheels were about half way between the first rail and the second rail. . . . At the time I was parked at the intersection and up to the time of the collision, I did not hear any train whistle or bell. I did not see or hear any moving passenger train."

Plaintiff's witness, E. E. Perdue, testified that "When the freight train on the second track was cut in two and pulled up, a car crossed from the south side, that is the opposite side from where I was sitting, and then a big truck came through. That is when I saw the train approaching on the first or southbound track. I saw the freight train on the northbound track cut in two. I do not know what became of the man who cut it in two. I did not see anyone left on foot at the crossing when the train was cut in two. . . . I saw the passenger train coming south on the first track. He looked to me like he was going to hit the truck. The truck cleared the track and I heard the crash between the plaintiff, Miller's automobile, and the train. This was a passenger train going south. . . . In my opinion this train was running at a speed of 45 to 50 miles an hour. . . . (Cross-examination): It is something like a half mile or more from the freight depot

in Thomasville down to the West End Crossing. The railway tracks from the depot to the crossing are absolutely straight. West Main Street parallels the railway tracks all the way from the railroad depot to West End Crossing. Both the tracks and the street run in an easterly to westerly direction and they run along for a half mile side by side. . . . I stood there in my car some five minutes. Shortly after I had stopped Mr. Miller, the plaintiff, also pulled up to the intersection and stopped. . . . If the whistle blew I did not hear it. . . . I don't think those lights were flashing at the time. . . . When the freight train opened up on the second track a truck came through from the south side or opposite side of the crossing and came on across. I saw the truck. Mr. Miller, the plaintiff, had to see it if he was looking. I looked up and looked toward the freight depot and saw the passenger train coming. I thought it was going to hit the truck. It was the same train that hit Mr. Miller. Q. And the view of that train all the way back to the station was a half mile or more? A. Yes, half a mile. I cut my eyes back on the track and Miller had pulled up on the track. It happened so quick I could not tell whether Miller hit the cylinder of the engine or the engine hit him. Anyway, I did not get hit. I sat there and let the train go by."

These central facts were amplified by other witnesses and additional testimony, but the foregoing will suffice for the disposition which we think must be made of the case.

The defendant moved for judgment of nonsuit at the close of plaintiff's evidence, which was overruled. Exception. The defendant offered no evidence.

The usual issues of negligence, contributory negligence and damages were submitted to the jury and answered in favor of the plaintiff. From judgment thereon, the defendant appeals, assigning as error the refusal of the court to sustain its motion for judgment of nonsuit.

*J. Allen Austin and Phillips & Bower for plaintiff, appellee.*

*W. T. Joyner, Linn & Linn, Don A. Walser, and D. L. Pickard for defendants, appellants.*

STACY, C. J. Conceding negligence on the part of the defendant in the operation of its train, as the jury has found, the question occurs whether plaintiff's contributory negligence is such as to bar a recovery. We had occasion to review the pertinent authorities in the recent case of *Godwin v. R. R., ante,* 281. From what is said there, it would seem that an affirmative answer should be given here.

It is established by all the evidence that the plaintiff started his car and drove a distance of eight or ten feet onto the crossing in front of an

oncoming train, which he should have seen in the exercise of reasonable care. This was negligence on his part which contributed to the injury. *Tart v. R. R.,* 202 N. C., 52, 161 S. E., 720.

The plaintiff does not say that he could not see the train—for Perdue who was similarly situated saw it—he only says that he did not see it and that he heard no signal of its approach. Nor does the plaintiff say there was anything to keep him from seeing the train or that there was anything to obstruct his view from where he was sitting in his car. His testimony is, that he looked in the direction the train was coming and listened and did not see or hear it. He assigns no reason for not seeing it, and the record affords none, other than his own want of due care.

The evidence in respect of the signs and poles on the right of way is not material to the inquiry. They did not obstruct the plaintiff's vision from where his car was stopped while he was waiting at the crossing. Nor does the failure of the automatic signals to function save the case from nonsuit. The plaintiff knew the signals were not working and was therefore put on guard that he could not rely upon them. And he did not rely upon them. He says that he looked in both directions and listened before starting upon the crossing. Hence, according to his own testimony, he failed to see the obvious. It was said in *Powers v. Sternberg,* 213 N. C., 41, 195 S. E., 88, that where every appearance indicated the plaintiff was running into a zone of danger which he should have seen, and which others similarly situated did see, if he did not, the plaintiff is barred from recovery.

The cases of *Oldham v. R. R.,* 210 N. C., 642, 188 S. E., 106; *Finch v. R. R.,* 195 N. C., 190, 141 S. E., 550; and *Shepard v. R. R.,* 166 N. C., 539, 82 S. E., 872, cited and relied upon by the plaintiff, are distinguishable by reason of different fact situations. In the *Finch case, supra,* which arose out of an injury at this same crossing, the traveler was waiting on the opposite side of the crossing, and the parted freight train there, which was on the track nearest him, obscured his vision so that he could not see the approaching passenger train, which was on the second track from him. Moreover, in the *Finch case, supra,* there was evidence that one of the crew of the freight train signaled the motorist to cross. Here, the facts are quite different. Likewise, in both the *Oldham* and *Shepard cases, supra,* there were extenuating circumstances which prevented the plaintiffs from seeing the approaching trains.

The result here is controlled by the line of decisions of which *Harrison v. R. R.,* 194 N. C., 656, 140 S. E., 598; *Eller v. R. R.,* 200 N. C., 527, 157 S. E., 800; and *Godwin v. R. R., supra,* may be cited as illustrative. We are content to rest our conclusion on what is said in these cases.

The demurrer to the evidence was well interposed.

Reversed.

CLARKSON, J., dissenting: The usual issues were submitted to the jury: Negligence, contributory negligence, and damages. All were answered in favor of plaintiff. The defendant introduced no evidence and did not make an exception to the charge of the court below, as it was so able and fair to the litigants. The defendant relies solely on the plea of contributory negligence.

The evidence as to the negligence of defendant was to the effect (1) that the passenger train that struck plaintiff was running through the town of Thomasville at a speed of 50 miles an hour, contrary to the ordinance of the town (which did not permit the operation to exceed 30 miles an hour). It was running about 73½ feet per second, 733⅓ feet in 10 seconds. Even assuming that the track was straight for half a mile from the crossing, at the speed the train was traveling, it covered this distance from the point where defendant claims it could have been seen to the point of impact in about 36 seconds—barely half a minute. During this half minute plaintiff was engaged in looking down the other end of the track and in starting his car. This is not the conduct of a negligent man. On the contrary, it is the normal and prudent conduct of a reasonable person.

The conduct of defendant was negligence *per se. Ledbetter v. English,* 166 N. C., 125, and other authorities too numerous to mention. (2) There was plenary evidence that the train did not ring its bell or blow its whistle. (3) On the second track, 27 feet from the first track, was a freight train or a shifter. This train was cut in two to let the traffic cross the railroad, but no flagman directed the traffic. (4) At this crossing was an automatic electric signaling device. It is admitted that "Since about May, 1926, there have been two automatic signaling devices at said crossing, each of which rests on a block of concrete, oval in shape, about 4 feet long, 3 feet wide, and about 2½ feet high, rounded off on the top, painted with alternating stripes of black and white, three or four inches wide, and located about the center of the width of the drive over the tracks known as West End Crossing. That the one on the north side was located about 3 feet north from the north rail of the southbound track, and the one on the south, about 3 feet south from the south rail of the northbound track. That each of the blocks form the base for an automatic electric signaling device, consisting of two red electric lights, designed and intended to cast two beams of red lights from the railroad, and a large automatic bell, or gong which is designed to sound a very audible alarm, which can be heard for several hundred feet. That they were designed and so arranged as to be thrown into operation by the moving train itself, upon the train approaching within about 800 feet of the crossing, and to continue their operation until the engine has cleared the crossing and automatically throw them out of

operation. That their purpose and use had always been to give the public timely warning of approaching trains. That when their lights were not burning, and their bells were not ringing, their purpose and use were always to indicate to the traveling public that no moving trains or cars were approaching dangerously near the crossing." This electric signaling device did not operate at the time of the injury, to give warning to plaintiff.

The setting: The plaintiff lived in the country, about 11 miles from Thomasville, but worked at the Columbia Panel Company in Thomasville. He went to and from work in his automobile, and on 20 March, 1940, he had several of his neighbors in the car going to work. After putting them out (except Stevens, who was riding in the back seat), plaintiff testified: "Then I came on down West Main Street to the West End Crossing. When I arrived at the crossing there was a train present, a freight or a shifter, I could not say which. It was headed east on the second or northbound track and towards the Thomasville depot. The crew cut the train in two and pulled the front part of it up, clearing the crossing. When I arrived at this crossing I stopped because of this freight train across the tracks. I stopped within 6 or 8 feet of the first rail of the track nearest to me, which is the southbound track. Q. Are there some automatic signal devices there? Ans.: Yes. Q. When you arrived, were they or were they not functioning? Ans.: No, sir. Q. How long did you stay there? Ans.: I would say some 3 or 4 minutes. M. S. Stevens was in the car with me and on the back seat. These automatic signal devices were not functioning at any time that I was parked there. They were not working. After the freight train was cut in two a car and a truck came across from the opposite side, or south side to the north side, where I was parked. As I recall the truck was a tractor and a trailer, a truck with a high body. I saw Mr. Perdue parked to my left in his automobile at the intersection. I also saw Hal Harris there. When I started to move my car across the intersection the truck had crossed and was starting into the highway. It did not obstruct my view to the east toward the depot. I had been using this crossing once or twice a day, five to six days a week for about six months, and was familiar with it. On March 20, 1940, I did not have any knowledge as to the condition of the automatic signals at this crossing. As soon as the truck cleared the crossing and ceased to obstruct my view towards the depot, I looked to my left in the direction of the depot and listened, and I looked to my right and listened before starting. My engine stopped while I was parked at the intersection. I started my engine at the time the truck came over the tracks and pulled on by me. I put my car in low gear and did not change it. I did not see the moving passenger train which struck me. The front end of my car was

MILLER *v.* R. R.

across the first rail of the first track when I was hit. The front wheels were about half way between the first rail and the second rail. . . . My automobile was struck at the front door on the left hand side. . . . At the time I was parked at the intersection and up to the time of the collision I did not hear any train whistle or bells. I did not see or hear any moving passenger train. I looked to my left towards the freight depot and listened, and I looked to my right towards Lexington and listened before I started. I saw another freight train coming from the direction of Lexington on the second track, some 2,000 feet behind the freight train that was stopped cut in two at the crossing. I saw that train approaching. It was 1,000 to 1,500 feet, possibly 2,000 feet away, I could not tell exactly. It was moving very slowly. . . . There were some sign boards in the northeast corner at the intersection of West Main Street and West End Crossing. I measured the signs. The one next to the road (West Main Street) is 30 inches by 4 feet, and had on it the words 'Drink, Drive and Regret.' The other sign was 4 feet by 2½ feet with white and black stripes and a reflector in the middle. The sign was about 2½ feet from the ground and the two signs were about 20 or 22 inches apart. In looking back to your left from where we were parked at the crossing, *those signs were setting in the way, in the view of the crossing, so that you could not see as far up the track as you could. There were also telephone poles along the track, the poles being about 50 feet apart.* The poles are dodged along. There was some box cars parked on the side track to the north of and parallel to the railroad. These cars were around 700 to 800 feet up the tracks towards the depot. I drove by these cars that morning and observed them. It was about 700 or 800 feet from the end of the box cars to the crossing. There was a whistle post about 25 steps below the box cars. . . . When I examined my car 8 or 9 weeks after the accident, it was still locked in low gear. I then tried to get it out of low gear and it could not be done. *After the man cut the freight train standing on the second track in two,* I never did see him any more. He was the only man I saw. *I did not see anybody out there giving any signals not to cross the crossing.* The condition of my eyesight on March 20th, 1940, was good. I have stepped the distance between the first rail of the southbound track and the margin of West Main Street. The distance between the two is 27 feet."

Plaintiff's health was good prior to the collision. His injuries consisted of 5 or 6 broken ribs, a blow in the left jaw, knocking out two lower teeth, a mashed foot (right foot), hip, back and shoulders bruised. He was unconscious for 48 hours. "I have not worked any since because I could not stand it." The doctor, hospital and drug bills, on account of the accident, amounted to arount $172.00. . . . I am not through with the Doctor yet." The question of contributory negligence was for the jury.

In *Harton v. Telephone Co.,* 141 N. C., 455 (465), *Hoke, J.,* says: "We think it the more correct rule that, except in cases so clear that there can be no two opinions among men of fair minds, the question should be left to the jury to determine."

This rule has been adopted by this Court ever since. In *Hinnant v. R. R.,* 202 N. C., 489 (493), *Brogden, J.,* said: "Courts generally are committed to the proposition that if the facts are admitted and so clear that 'there can be no two opinions among men of fair minds,' or that 'only one inference may be drawn from them,' it is the duty of the court to declare whether a given act or series of acts is the proximate cause of the injury. Otherwise the question must be submitted to a jury. *Harton v. Telephone Co.,* 141 N. C., 455, 54 S. E., 299; *Taylor v. Stewart,* 172 N. C., 203, 80 S. E., 134; *Lineberry v. R. R.,* 187 N. C., 786, 123 S. E., 1."

The evidence indicates that the defendant was grossly negligent in running its train through the town 45 to 50 miles an hour, contrary to the town ordinance, which was not over 30 miles an hour. This conduct was negligence *per se:* giving no signal by ringing the bell or blowing the whistle; cutting the freight train in two on the second track, 27 feet from the first track, thus inviting the traffic to cross the public highway, which crossed the railroad tracks. In having safety signals not functioning to give warning to the traffic that a train was coming, defendant lulled the crossing traffic into a sense of security that the way was clear to go forward. Defendant's negligence in cutting the train in two invited the traffic to cross. The traffic coming toward him, a car and truck to which was attached a trailer. At the very point the view on one approach of the train was obstructed to some extent and the other view of the oncoming train could not be discovered to some extent by obstructions. This was some evidence that it obstructed plaintiff's view of the oncoming train, although he had looked and listened. The train came from plaintiff's left, on which side Perdue's car was waiting to cross the track. With another car between a driver and a train traveling so fast that it was in view only half a minute, it is difficult to see how the driver could be considered negligent in not seeing the train. The twelve jurors agreed unanimously that he was not negligent and, in my opinion, this Court goes too far when it says no fair-minded man could say plaintiff was not negligent. All the facts taken together indicate that plaintiff used due care. The train approached at so high a rate of speed that it struck plaintiff after he had started and had put his machine in low gear to cross. It hit him like a shot out of a gun. Under these facts and circumstances, it was a question for the jury and not for this Court to determine on the question of contributory negligence. It is only when facts admitted are so clear that only one inference can be drawn from

them and there can be no two opinions among men of fair minds, that this Court and not a jury will determine the rights of the parties.

I think the cases cited in the main opinion, and chiefly *Harrison v. R. R.,* 194 N. C., 656, and *Godwin v. R. R., ante,* 281, and other cases, are not applicable. Those were ordinary crossing cases, with no invitation to cross by breaking the cars in two and no dead electric signal—both of which plaintiff had a right to rely on. Plaintiff saw that the signal was dead for the shifting freight train, but since the signals were installed primarily to protect the public as to through trains, he could reasonably infer that the signals would give him warning as to any through train. This they did not do.

*Hoke, J.,* in *Shepard v. R. R.,* 166 N. C., 539, at p. 544, quotes from *Cooper v. R. R.,* 140 N. C., 209 (221), which he wrote for the Court, in which is laid down certain rules as to travelers approaching a railroad crossing, as follows: " 'Rule 7. There may be certain qualifying facts and conditions which so complicate the question of contributory negligence that it becomes one for the jury, even though there has been a failure to look or listen, and a traveler may, in exceptional instances, be relieved of these duties altogether, as when gates are open or signals given by a watchman and the traveler enters on the crossing reasonably relying upon the assurance of safety.' These rules and the one last mentioned as being more particularly applicable to the questions presented on this appeal have been frequently upheld and applied in decisions of our Court, notably in the recent case of *Johnson v. R. R.,* 163 N. C., 431; *Fann v. R. R.,* 155 N. C., 136; *Wolfe v. R. R.,* 154 N. C., 569; *Farris v. R. R.,* 151 N. C., 483. It is also established by the weight of authority that it is not always imperative on a traveler to come to a complete stop before entering on a railroad crossing; but, 'whether he must stop, in addition to looking and listening, depends upon the facts and circumstances of each particular case, and so is usually a question for the jury.' *Alexander v. R. R.,* 112 N. C., 720; *Judson v. R. R.,* 158 N. Y., 597; *Malott v. Hawkins,* 159 Ind., 127-134; 3 Elliott on Railroads (2nd Ed.), sec. 1095, Note 147; 33 Cyc., pp. 1010, 1011-1020."

In *Oldham v. R. R.,* 210 N. C., 642 (643), we find: "Does the plaintiff's alleged contributory negligence bar a recovery as a matter of law? The answer is 'No.' *Lincoln v. R. R.,* 207 N. C., 787, 178 S. E., 601. The issue was for the twelve. . . . The pertinent principle was stated by *Hoke, J.,* in *Shepard v. R. R.,* 166 N. C., 539, 82 S. E., 872, quoting from 33 Cyc., 1028, as follows: 'Where a railroad company maintains a flagman, gates, or other signal or warning at a railroad crossing, whether voluntarily or by law or custom, the public generally has a right to presume that these safeguards will be reasonably maintained and attended, and in the absence of knowledge to the contrary,

the fact that the gates are open, or automatic bells not ringing, or that the flagman is absent from his post or, if present, is not giving a warning of danger, is an assurance of safety and an implied invitation to cross upon which a traveler familiar with the crossing may rely and act within reasonable limits, on the presumption that it is safe for him to go on the crossing. The extent to which a traveler may rely on such assurance is a question of fact, and while ordinarily the same degree of care and vigilance is not required of a traveler under such circumstances as otherwise, he has no right to rely exclusively upon such circumstances, nor will such presumption or assurance excuse the traveler from using every reasonable precaution that an ordinary prudent man would use under like circumstances. Such facts as the absence or presence of a flagman, or that the gates are open, or that the automatic bells are ringing ·or not ringing, are merely facts to be considered in determining whether the traveler exercises that degree of care required in attempting to cross.' The same rule was also applied in the case of *Parker v. R. R.,* 181 N. C., 95, 106 S. E., 755; *Barber v. R. R.,* 193 N. C., 691, 138 S. E., 17; and *Johnson v. R. R.,* 163 N. C., 431, 79 S. E., 690. The negligence of the defendants is not seriously disputed. The watchman was 'out of pocket' as plaintiff approached the crossing. If he had been attentively on duty at that time, the injury might not have occurred. *Shepard v. R. R., supra; Finch v. R. R.,* 195 N. C., 190, 141 S. E., 550."

The case of *Barber v. R. R.,* 193 N. C., 691, is directly in point, there the facts were left to the jury. The facts there were: "Plaintiff, coming down East Market Street, near Settle Street crossing, slowed up his car, waiting for a long freight train, about 70 cars, to pass, going south, which was making the usual roaring noise, and for everything to get clear. Before he turned from East Market Street into Settle Street, he looked, glanced back, and could see some 75 yards. As he started to turn he looked for the watchman—could see through the glass, the whole street was clear. Leaned over and looked south down railroad track to the left—the track was clear, could see down some 60 yards. When he proceeded to cross Settle Street he was running about 5 miles an hour. Just as he got up on the first track, he heard a danger signal of several sharp blasts of the whistle of the train coming from the south, and about the time he saw the watchman coming half-running from the opposite side of Settle Street, that he had started to cross, hollering 'Stop.' He stopped as quick as he could, reversed his car, and backed back about four feet, and while moving back the passenger train struck the front end of the car. The car was knocked about 60 feet. The Fillman boy was killed, plaintiff was seriously injured, and the car torn to pieces. The watchman's shanty was knocked off its foundation by the automobile, which was knocked about 60 feet." This case cites the

*Shepard case, supra,* which quotes from 22 Cyc., *supra,* and a wealth of other authorities.

*Finch v. R. R.,* 195 N. C., 190, is similar to the present case and at the same crossing. At p. 201, the Court says: "In the charge heretofore quoted, the court below said: 'There may be certain qualifying facts and conditions which so complicated the question of contributory negligence that it becomes one for the jury, *even though there has been a failure to look or listen, and a traveler may, in exceptional instances, be relieved of these duties altogether, as when gates are open or signals given by a watchman and the traveler enters on the crossing* reasonably relying on the assurance of safety.' "

The *Barber case, supra,* and numerous other cases are cited to the effect that the question of contributory negligence was for the jury. In *Finch v. R. R., supra,* we said, at p. 199: "In *Harrison v. R. R.,* 194 N. C., p. 656, the facts were different from the present action." In the *Finch case, supra,* the jury returned a verdict of $140,000. A new trial was granted on a different ground from that here considered.

The evidence must be taken in the light most favorable to plaintiff, and he is entitled to the benefit of every reasonable intendment and inference to be drawn therefrom. Where there is conflicting evidence as to the proximate cause of the injury, the case is for the jury. *Barrier v. Thomas and Howard Co.,* 205 N. C., 427; *Godfrey v. Coach Co.,* 201 N. C., 264.

This crossing has been before this Court before. *Finch v. R. R., supra.* In that case also a freight train was parted to let the traffic through, and the intestate without looking drove his car through the opening thus made only to meet his death. On appeal by the defendant this Court said the case was for the jury. At a companion crossing further north in Thomasville, where there were also some obstructions, the plaintiff suffered injury and this Court affirmed the recovery. *Loflin v. R. R.,* 210 N. C., 404. Later, as a better safeguard to the traveling public in this busy city, at the crossing involved in this case, the defendants installed modern automatic electric signals for the safety of the traveling public. Railroads are required to maintain and attend these automatic signals when installed; otherwise, they become the opposite of a safety device; they become invitations to injury and death. Wherever a crossing accident occurs and the automatic signals are not functioning, a motion for nonsuit, I think, should be denied except in the clearest case of contributory negligence. This is not such a case. One ought not to invite and then not bear the responsibility of his invitation, except only as to those whose conduct is or borders clearly upon the lack of due care. Due care, on the issue of contributory negligence under the facts here, is for the jury and not this Court to determine.