On 27 March, 1913, the plaintiff was driving his automobile from the Seaboard Air Line Railway station at the north end of Tryon Street in the city of Charlotte, in a southerly direction along that street to Ninth Street, intending to turn into the latter street; but when he reached it, he found it blocked by a wagon and a rope across it. He reversed his car and backed out over the two street railway tracks, laid at that point on Tryon Street, and looked in the direction he was going, to see if there was anything in the way to prevent him from backing over to the other side of the street, where he expected to turn toward the south and proceed *Page 589 
down Tryon Street towards Independence Square. On direct examination he testified: "No, I didn't see any street car coming. No, I didn't hear any street car coming. I backed out between the second two (535) wagons across both tracks and was in the act of going forward. I think I was moving forward at the time the street car struck me, trying to turn to go back up Tryon Street towards the Square. I never did discover the street car that hit me. I do not think they rang any bell or sounded any gong. I heard no noise. When the street car hit me I was knocked unconscious. Yes, my automobile had a top on it, and the top was up. I had a hole cut in the back of my head and my collar bone was broken." And on cross-examination he testified: "I had backed out and I had to back off those street car tracks in order to let a wagon pass; then I was bound to turn on that track a little bit to get on the west side of the car track to come on back towards the Square. Yes, sir, I intended to get across the track at last and put myself on the west side where I had been before, and come on up here. Yes, that is what I intended to do. No, I did not hear any automobile or street car either. I think I listened. I am positive that I did. I heard none, and I saw none. No, sir, I did not look up towards the Square to see whether a car was coming before I backed on the track. No, I really do not know whether I was hit by a car coming from that way or from the other way. Yes, sir, I knew when I started to back that I had to cross both of those tracks, and I didn't look. I didn't look up this way very far. I looked back out of the window of the car back onto the street to see where I was backing. I did not look up towards the Square to see if a car was coming down. No, I didn't look straight towards the depot. No, I didn't look very far either way; just where I was backing was where I was looking. Yes, sir, it is right. I looked where I backed and didn't look either up or down; that is a fact. I will stand by that, for it is right. No, I did not look either up or down the track. The first thing I knew I was hit, and that is all I know about it."
The ordinance of the city prohibited the speed for a street car to exceed 15 miles an hour at that place, and there was evidence that it was running at 25 miles an hour. The car was moving on the west track, and the motorman testified that he did not know that plaintiff was going to back as far as his track, as he had plenty of room to turn around before reaching it, and that when he got on the west track the car was about 30 feet or a little more from him, and it was too late to stop it. That he rang the bell and took all necessary precautions to prevent an accident; shut off the current and reversed the car. There was evidence, on the contrary, that the car was from 150 to 200 feet when plaintiff backed upon the west track; that the gong was not sounded and that it *Page 590 
could be seen that plaintiff was not looking for a car in either direction. The plaintiff himself testified that he was backing his car with the top up and that he was not looking in either direction for a car, and (536) was not aware of any danger, and did not know the car was near him until he was struck by it.
The jury returned the following verdict:
1. Was the plaintiff injured by the negligence of the defendant company, as alleged in the complaint? Answer: "Yes."
2. Did the plaintiff, by his own negligence, contribute to his injury, as alleged in the defendant's answer? Answer: "Yes."
3. Notwithstanding the contributory negligence of plaintiff, could defendant, by the exercise of ordinary care, have avoided the injury to the plaintiff? Answer: "Yes."
4. What damage is plaintiff entitled to recover of defendant? Answer: "$1,250."
Defendant, in due time, objected to the submission of the third issue. It moved to nonsuit the plaintiff, and requested that the court give the following instruction to the jury: "In order to answer the third issue `Yes,' you must find from the evidence, and by the greater weight thereof, that although the plaintiff was guilty of negligence which contributed to bring about his injury, yet before he was injured, his (the plaintiff's) negligence ceased and culminated and that thereafter the defendant had a clear chance to avoid injuring the plaintiff by the exercise of due care; and unless you do so find, that is, unless you find that the plaintiff's negligence ceased before the injury, and the defendant thereafter had a clear chance to avoid injuring the plaintiff, and negligently failed to avail itself of such chance, you should answer the third issue `No.'" The request was refused, and defendant excepted.
In regard to this (third) issue the court charged the jury: "(If you answer the second issue `Yes,' and if you find that after the plaintiff had negligently gone upon the defendant's track he was in a position of peril from threatened contact with the car, and was apparently insensible to the approach of the car; and if you find that the motorman in charge of the car saw, or by the exercise of ordinary care would have seen, his perilous position and averted the injury by any means reasonably consistent with the safety of the street car and the passengers thereon, it was the duty of the motorman to make use of such means; give the proper signals, if reasonably necessary; lessen the speed of the car, and, if reasonably necessary and practicable, to stop the car in time to avoid the injury; and if you find, under these circumstances, that the motorman failed to perform this duty, you will then find that the defendant was negligent; and if you further find that plaintiff, in consequence, was injured, and *Page 591 
that the defendant's negligence was the proximate cause of the injury, you will answer the third issue, `Yes.') If you do not so find, you will answer it `No.'"
Defendant excepted to the part of the instruction which is (537) inclosed in parentheses.
There was no other exception to the charge, except as to the definition given in connection with the instruction upon the third issue, as follows: "Now, what is proximate cause? Proximate cause of an event is that which, in natural and continuous sequence, unbroken by any new and independent cause, produces the event, and without which it would not have occurred. (Proximity in point of time or space is no part of this definition.)" Defendant excepted to the part of this instruction which is in parentheses.
Judgment was entered upon the verdict, and defendant appealed.
There was no error in denying the motion to nonsuit the plaintiff, and the exception to the submission of the third issue, which presents practically the same question, was properly overruled. Whatever may be the law in some of the other jurisdictions — and we concede that it seems to be radically and directly at variance with our rulings upon this question — the law here has been well settled for many years, and we do not feel at liberty to disturb it, after it has been so firmly imbedded in our jurisprudence. The law as declared by some of the courts would make this, in one view of the facts, a clear case of concurrent negligence, upon the ground that the omission of the plaintiff to look and listen and the failure of the motorman to exercise care by looking ahead and to take proper precautions for avoiding danger and preventing collisions, were concurrent, or, as sometimes called, simultaneous acts of negligence, both of them having an equal chance and a fair opportunity of preventing the collision and the consequent injury to the plaintiff and his automobile, and both being bound to the same degree of care. But with us this is not so, under the facts and circumstances of the case. There is, to begin with, no possible analogy between a case growing out of an injury caused by a street railway car to a person rightfully upon the public thoroughfare and a case involving an injury inflicted by a steam railroad train on a trespasser wrongfully upon the latter company's right of way. And this is so because the citizen has the same privilege to use the street for travel that the street railway company has for propelling its cars thereon. The *Page 592 
franchise to lay its rails upon the bed of the public street gives to the company no right to the exclusive use of that street, and in no respect exempts it from an imperative obligation to exercise due and proper care to avoid injuring persons who have an equal right to use the same thoroughfare. It is bound to take notice of, recognize, and respect (538) the right of every pedestrian or other traveler; and if by adopting a motive power which has increased the speed of its cars it has thereby increased, as common observation demonstrates, the risks and hazards of accidents to others, it must, as a reciprocal duty, enlarge to a commensurate extent the degree of vigilance and care necessary to avoid injuries which its own appliances have made more imminent. The right of the wagon, in certain particulars, is subordinate to that of the railway; the street car has, because of the convenience and exigencies of that greater public which patronizes it, the right of way; whether going in the same direction ahead of the car or in an opposite one to meet it, the driver of the wagon must yield the track promptly on sight or notice of theapproaching car; but he is not a trespasser because upon the track; he only becomes one if, after notice, he negligently remains there. The company has the superior right to the use of its own tracks, as otherwise it could not use them at all. If a wagon and a car meet going in opposite directions, the wagon must turn out, because the car cannot. If going in the same direction, the wagon must also get off the track, because the car cannot go around the wagon, and the public convenience requires a car to travel at a greater speed than the ordinary vehicle. But this superior right is not exclusive, and will not justify the company in needlessly interfering with the convenience of the public, or excuse it from the consequences of its own negligence. Where the wagon and car meet at right angles, either can stop long enough for the other to pass without serious inconvenience, and as the wagon must cross the track in order to proceed, it is said that under such circumstances the rights of the wagon are somewhat greater than between crossings, with a corresponding obligation resting upon the railway company to exercise greater care on account of the greater probability of meeting vehicles and pedestrians, with the increased risk of accidents. But this rule cannot be extended to interfere with the right of the public to cross the track with reasonable care at any point that their convenience may suggest. The foregoing principles are supported by Moore v. Railway Co., 128 N.C. 456, and have been epitomized by us from that case, so far as the questions there decided are presented here and are pertinent to this discussion.
If the motorman, W. N. Turner, saw the plaintiff's car on the western track in front of his car, which was on the same track, and also knew that plaintiff, being forgetful of his duty and inattentive to his surroundings, *Page 593 
was not aware of the approach of the car, and, on that account, was making no effort to leave the track, and this knowledge came to him in time to prevent the collision, and he knew that a collision would occur if plaintiff did not leave the track in time to prevent it, unless the street car was itself stopped before reaching the automobile, it was his plain duty, according to our decisions, as soon as a collision became probable, to slow down and bring his car under control, so that he could stop, (539) in order to prevent the catastrophe which would inevitably happen if he proceeded on his way and plaintiff did not move his automobile away from the track. If the motorman saw that the plaintiff had evidently not looked and listened, and had not heeded his signal, if he gave one, and was, therefore, unconscious of his danger and not likely to leave the track, it was incumbent on him to take reasonable precaution for his safety; and as he had the better opportunity of so acting as to prevent the collision, he is adjudged by the law, under the circumstances, to have had the last clear chance of averting the injury, and the defendant, therefore, is the responsible author of it. A person on foot or in a vehicle has no right to cross a street in front of an approaching street car and take the doubtful chance of his ability to cross in safety, if a prudent man would not do such a thing under similar circumstances; and if he does so, and is injured by his own carelessness, the fault is all his, and he cannot hold the company to any liability therefor. But the case we have is quite different, as here the plaintiff was seen by the conductor when backing, at a crossing, towards the western track on which the car was moving; he was oblivious of his dangerous surroundings, which might have been seen by the motorman if he was keeping a proper lookout, and he testified that he was doing so. It would seem to be just and humane to hold that, if such were the situation, and the jury afterwards found it to be so, the defendant should be held responsible, as having the superior chance to avoid the injury, though the plaintiff was also negligent, and grossly so. Such, anyhow, is our law.
In Lassiter v. R. R., 133 N.C. 244, the intestate, A. E. Lassiter, was on the track of the defendant, attending to his business of overseeing the shifting of cars, as an employee of the defendant. He was unconscious of the fact that a train was being backed towards him on the same track, by reason of the fact that his attention was fixed on what he was then doing. There was no one on the leading box car of the backing train to warn him of his danger. The Court first distinguishes the case from that of a pedestrian walking on a railroad track in front of an approaching engine or train, who is run over and injured, upon the ground that, being a trespasser, or even a licensee, he has no right to impede the reasonable use of the track by the company, and being apparently *Page 594 
in possession of his faculties, the engineer may fairly presume, even to the last moment, when it is too late to save him, that he will step off the track and save himself. It then proceeds to say: "In this case the intestate, according to the evidence of Thomason, was at a disadvantage; was not upon equal opportunities with the defendant to avoid the injury; for his manner and conduct showed that he was oblivious to his surroundings and was engrossed in the management of his train (540) and its hands. His actions showed that he did not hear the bell ringing. Now, if there had been on the backing box car a flagman, or watchman, he would have seen the intestate's obvious absorption in his work and heard the efforts of Thomason to give him warning. The condition of the intestate was as helpless as if he had been asleep or drunk on the track, and the defendant owed him at least as high a duty as if he had been asleep or drunk." And again, in the same case, it was said: "The evidence was competent and fit to have been submitted to the jury upon the question of the last clear chance of the defendant — that is, whether if both the plaintiff and the defendant had been negligent, the defendant could have prevented the death of the intestate by the use of means at hand or that reasonably ought to have been at hand. In Pickett v. R. R., 117 N.C. 616, the Court said: `If it is a settled law of this State (as we have shown) that it is the duty of an engineer on a moving train to maintain a reasonably vigilant outlook along the track in his front, then the failure to do so is the omission of a legal duty. If by the performance of that duty an accident might have been averted, notwithstanding the previous negligence of another, then under the doctrine of Davies v. Mann, 10 M. and W. (Exch.), 545, and Gunterv. Wicker (85 N.C. 310), the breach of duty was the proximate cause of any injury growing out of such accident, and when it is a proximate cause the company is liable to respond in damages. Having adopted the principle that one whose duty it is to see does see, we must follow it to its logical results."
A careful reading of the Lassiter case will show that the Court regarded the intestate as having been grossly negligent in leaving a safe place for the performance of his work, and taking, instead of it, a most dangerous one on the track. The decision was put squarely on the ground that the defendant had the last clear chance to avoid the natural and probable effect of his negligence by the exercise of proper care in having some one on the leading car to give warning of the approach of the train, or to have it stopped, if need be, by signaling the engineer of danger ahead, and intestate's position of danger was as apparent, although he was merely inattentive and unaware of the danger, "as if he had been *Page 595 
asleep" or "drunk and down" on the track. The two cases are parallel. See, also, Smith v. R. R., 132 N.C. 819.
If the motorman saw that the plaintiff did not hear or heed his signal, if given, the latter's position was no less perilous than if he had been deaf and could not hear. He had no right to kill or injure plaintiff or to break up his automobile, even if he was careless, or even grossly negligent, provided he had a fair and reasonable opportunity to avoid it without injury to his passengers, and especially after seeing and appreciating the danger in going ahead with his car.
The doctrine of Lassiter's case has been sustained by a long (541) line of decisions in this Court. Clark v. R. R., 109 N.C. 444;Deans v. R. R., 107 N.C. 686; Smith v. R. R., 114 N.C. 734; Bullockv. R. R., 105 N.C. 180.
Nellis on Street Surface Railroads, at p. 300 (ch. V, sec. 9) referring to the duty of a motorman with respect to travelers on the street, says: "Seeing a person driving along the road parallel with the track as though he had no intention of crossing it, he is not guilty of negligence because he did not anticipate that such person would suddenly turn across the track in the middle of a block. But if he sees the driver of a wagon in front of him does not look back, nor pay any attention to the ringing of the bell, nor increase his rate of speed, nor attempts to leave the track, it is his duty to bring his car under control, and even to stop, if necessary to avoid collision. He should stop his car at once upon seeing the wheels of a heavily loaded wagon in front of it slip on the track while the driver is attempting to get out of the way."
Hicks v. Railway Co., 124 Mo., 115, first lays down the proposition that persons in wagons and other vehicles have the undoubted right to pass over or upon street car tracks without hindrance. Yet the right of a traveler to drive a vehicle upon or along a street railroad track does not absolve him from the duty of looking for approaching cars. The cars can only move upon the tracks, and are used for the convenience of the public, and are consequently entitled to the right of way as to all others. It is, therefore, the duty of a traveler to give way to approaching cars so as to cause no unnecessary hindrance. Adolph v. R. R., 76 N.Y. 532; R. R. v.Isley, 49 N.J. L., 468; Wood v. R. R., 52 Mich. 402. The Court then proceeds to declare: "We are not able to say that the evidence shows conclusively that plaintiffs violated any of these rules, unless it was in driving upon the track without observing the cars, which must have been very near them. But that negligence was clearly not the proximate cause of the injury, for plaintiffs not only got safely upon the track without injury, but they were seen by the servants of defendant, and, by their timely action, a collision was then averted. After *Page 596 
that, the conduct of the plaintiff could not be declared negligent as a matter of law. Whether they could have left the track more expeditiously than they did, and whether doing so would have avoided the injury, were questions for the jury. It seems to me that there was very little evidence tending to show contributory negligence in the case; but we cannot say there was none. Defendant's gripman saw plaintiffs in their dangerous and exposed situation, and the chief question is whether, after that, he acted with due care towards them. Hanlon v. R. R., 104 Mo., 389, and cases cited." The facts there were not substantially unlike those in the case at bar.
(542) The case of Hanlon v. R. R., 104 Mo., 389, which was cited in the Hicks case, is so much in point and expresses our views so aptly that we are fully justified in quoting from it liberally. It states the contention of defendant in this case and conclusively answers it, and in perfect accordance with the reasons we have heretofore given, which, moreover, are sustained by our own cases. The Court there says: "It is insisted that, although the signals were not given, and if they had been given the injury have been averted, still the negligence of plaintiff himself, in not observing the common prudence of looking out for his own safety, concurred with that of defendant, and the injury resulted on account of the concurring negligence of both, and for that reason debarred plaintiff from recovery. It is well settled by authority, as well as enjoined by the common dictates of prudence, that one going upon the track of a railroad should observe all such precautions for his own safety as reason and prudence dictate; and if disaster comes upon him by reason of a failure to do so, he must bear the consequences. This rule has, however, a qualification which is founded upon principles of humanity and is universally recognized. This qualification enjoins upon the railroad company the duty of using all reasonable efforts to avoid injury to one who has negligently placed himself in a position of danger, if the peril is known, or, under certain circumstances, by reasonable care might have been known. A failure to observe this requirement renders the company liable, notwithstanding the previous negligence of the person injured. The rule and the qualification of it require precautions to be observed by both the railroad company and the traveler, when using a public highway in common. The precautions to be used by each must necessarily vary, with varying circumstances, and no positive rule can be laid down which can be made a test in every case. One rule for their mutual government is imperative, which is the duty and obligation for each to watch for the presence of the other, one to avoid being injured, the other to avoid causing injury. The railroad company must give some regard to the known imprudence of mankind, and not content itself *Page 597 
with the mere obedience of the law requiring signals to be given; and the traveler must, in like manner, take precautions for his own safety, and not depend entirely upon the railroad company to protect him, or give him timely notice of danger," citing Yancey v. R. R., 93 Mo., 436; Rine v. R.R., 88 Mo., 396; Kimes v. R. R., 85 Mo., 611, and numerous other cases in support of the several principles announced.
There are other reasons for denying the motion to nonsuit or for the withdrawal of the third issue. There was evidence that the street car was being run at a greatly excessive speed, in violation of the city ordinance fixing the maximum at 15 miles per hour, whereas the speed of the car was 25 miles an hour. This was, at least, evidence of negligence, as decided in Davis v. Traction Co., 141 N.C. 134, (543) and prevented the judge from taking the case away from the jury by a nonsuit or a directed verdict. This very question was settled against the street car company in that case. Justice Connor there said, at p. 140: "It is undoubtedly true that if a car is moving at a lawful — that is, not excessive — speed, and a person enters upon the track, the defendant is required to use ordinary care, give the signals, lower the speed, and, if it appears reasonably necessary, stop the car. If the car is properly equipped and the equipment used with reasonable promptness and care, the defendant will not be liable for an injury sustained. If, however, the car is moving at an excessive speed — that is, a speed in excess of that prescribed by the city ordinance — and by reason of such excessive speed the signals cannot be given or the appliances used by the exercise of ordinary care, the defendant will be liable for an injury, and this for the reason that it has, by the excessive speed, brought about a condition which it cannot control. It was therefore proper for his Honor to modify the instruction by inserting the words, `and the car was not running faster than 14 miles an hour.' This gave the defendant the benefit of the principle invoked, unless the jury found that the speed was excessive. This Court has held, in accordance with many others, that speed in excess of that prescribed by the ordinance is at least evidence of negligence, and his Honor so instructed the jury. Edwards v.R. R., 129 N.C. 78." And again, at p. 142: "The duty is imposed upon the managers of the car to move at a reasonably safe speed, the maximum of which in Durham is by ordinance fixed at 14 miles an hour; to equip the car with signals and means of controlling it — bringing it to a stop when necessary." The decision clearly recognizes the principle that, as the car must run on the track or not at all, and the citizen on foot or in a vehicle of any kind can so easily and promptly change his course, and use for his purpose the spaces of the street between the tracks and the curb, he must, in the exercise of due care, give way to the car in *Page 598 
order to prevent a collision; but the Court also says that this does not excuse the negligence of the street car company if it runs into the citizen or his vehicle and injures him or his property when, after seeing his perilous position, or when it could have been seen with the exercise of due care, it fails so to act in the control and management of the car as to cause him injury, provided it had time to prevent it by the exercise of such care; and upon this question the jury have the right to consider whether by the excessive speed or other previous negligent act it had deprived itself of the ability to save him or his property.
What was done by the plaintiff in the operation of his automobile and what by defendant in the running of its car were questions for the jury upon the vital issue as to who had the last clear chance to avoid (544) the final catastrophe. Plaintiff's negligence, which we admit was gross, did not forfeit his right to be treated by defendant with ordinary consideration and humanity. The motorman could not drive the car upon his automobile, smash it up and injure him, simply because he happened to be upon the track, all unconscious of his dangerous position.
It was for the jury to say, upon all of the evidence, whether the plaintiff saw the approaching car in time to clear the track, and whether the defendant's motorman had reasonable grounds to believe that he did, and that he would turn from the track before the car could reach him, or whether the motorman knew, or should have known, that he was not aware that the car was coming, and, therefore, was not likely to get out of the way. If they found the facts last stated, then it became the duty of the motorman to give proper signals and to so operate the car with due care as to prevent injuring him or his automobile; and in this view it had the last clear chance. We think that, in this respect, our view may be reconciled with the cases cited by defendant's counsel from courts in other jurisdictions.
The only instruction requested was not a correct one, and was, therefore, properly refused. The liability of defendant, under the doctrine of the last clear chance, did not depend upon the "cessation or culmination of plaintiff's negligence." What is meant by the quoted expression, which is used in the instruction, we suppose to be that plaintiff's negligence must have spent its force, or have become dormant or inactive. But this was not necessary to constitute the defendant's negligence the proximate cause of the injury. The very fact that the plaintiff, in the presence of danger, continued to be negligent, and in apparent ignorance of the danger with reference to the car, but increased the duty of the defendant's motorman to be on his guard and to adjust his conduct to that situation by lessening the speed of the car, bringing it under *Page 599 
control and generally placing himself in a state of readiness to stop, should it be necessary to do so. He should have prepared for the natural and probable eventuality, in view of the plaintiff's persistent neglect of his own safety. This is the common sense and the justice of the case, when looked at from any angle of vision.
Nor do we think it was a vital error, if error at all, for the court to have said, as it did say, in defining proximate cause with reference to "the last clear chance," that proximity in point of time and space is no part of the definition. He properly defined proximate cause as that which, in natural and continuous sequence, unbroken by any new and independent cause, produces the result, and without which it would not have occurred, and from which a man of ordinary prudence could have foreseen that such a result was probable under all the circumstances as they existed and were known or should, by the exercise of due care, have been known to him. Sh. and Redf. on Neg., secs. 25 (545) and 28; Kellogg v. R. R., 94 U.S. 469; Ins. Co. v. Boon,95 U.S. 117; Ins. Co. v. Tweed, 74 U.S. (7 Wall.), at p. 52; Brewster v.Elizabeth City, 137 N.C. 392; Ramsbottom v. R. R., 138 N.C. 38, andRidge v. R. R., ante, 510, where the subject is fully discussed. In Ins.Co. v. Boon, supra, the Court thus defined it: "The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, though they may be nearer in time to the result. It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster. A careful consideration of the authorities will vindicate this rule." And again, quoting from Brady v.Ins. Co., 11 Mich. 425, it says: "That which is the actual cause of the loss, whether operating directly or by putting intervening agencies, the operation of which could not be reasonably avoided, in motion, by which the loss is produced, is the cause to which such loss should be attributed." Phillips on Insurance, sec. 1097, referring to Gordon v. Rimmington, 1 Camp., 123, thus deals with the question: "The maxim causa proximaspectatur affords no help in these cases, but is, in fact, fallacious; for if two causes conspire, and one must be chosen, the more scientific inquiry seems to be, whether one is not the efficient cause, and the other merely instrumental or merely incidental, and not which is nearer in place or time to the consummation of the injury." And in R. R. v. Kellogg,supra, the Court says: "The true rule is that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it. The primary *Page 600 
cause may be the proximate cause of a disaster, though it may operate through successive instruments, as an article at the end of a chain may be moved by a force applied to the other end, that force being the proximate cause of the movement, or as in the oft-cited case of the squib thrown in the market-place. 2 Blk. Rep., 892. The question always is, Was there an unbroken connection between the wrongful act and the injury — a concatenated operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? We do not say that even the natural and probable consequences of a wrongful act or omission are in all cases chargeable to the misfeasance or nonfeasance. They are not when there is a sufficient and independent cause operating between the wrong and the injury. In such a case the resort of the sufferer must be to the originator of the intermediate cause. But when there is no (546) intermediate efficient cause, the original wrong must be considered as reaching to the effect and proximate to it. The inquiry must, therefore, always be whether there was any intermediate cause disconnected from the primary fault, and self-operating, which produced the injury. Here lies the difficulty."
We may, though, safely rest our decision of this case upon Wheeler v.Gibbon, 126 N.C. 811, where a man driving a buggy in the direction towards which a heavy rain was being driven by a high wind up Tryon Street (the same one mentioned in this case), and ran into Mr. Wheeler, the plaintiff, who was crossing with his umbrella over his head to protect him from the rain. The present Chief Justice there said, and it fully covers this case: "Could the defendant, by the exercise of ordinary care, have avoided the injury to the plaintiff, notwithstanding the negligence of the plaintiff? This was the crucial issue of fact, and was peculiarly for the consideration of the jury, for we cannot agree with the appellant that the court could instruct the jury that on such a state of facts, in law, the proximate cause of injury was due to the plaintiff. That is the very fact which the jury, not the court, must determine. The negligence may have been concurrent, or the last negligence may have been the plaintiff's, or notwithstanding the negligence of the plaintiff the defendant could, with the exercise of ordinary care, have prevented his horse striking, and his conveyance running over, the plaintiff. The jury, and they alone, were competent to determine the fact, for there was evidence for their consideration. The plaintiff was crossing, with his head tucked behind his umbrella. This was negligence. The defendant was driving rapidly, `10 miles an hour, or at top of his speed,' and with his oilcloth up in front of the buggy; and this was negligence. He was driving in the same *Page 601 
direction with the storm, and was in a vehicle, and therefore could keep a better lookout. Then his horse and vehicle could do damage to a foot passenger — and did — while the foot passenger was not likely to run into him and do damage, and the defendant should have kept a lookout correspondingly careful to avoid injury. The jury under proper instructions have found that if the defendant, himself driving negligently, had used ordinary care, he could have seen the plaintiff negligently crossing the street in a pelting storm with his head hid behind his umbrella, in time to avoid running over him. This was a pure question of fact, and the Court cannot review it." But the defendant's negligence in our case was the active, efficient, and predominating cause of the injury, and also was the last in point of time, if it was guilty of any negligence, and the jury have found that it was, upon evidence that reasonably supports the verdict.
It follows that no error was committed in the trial of the case.
No error.
Cited: Ingle v. Power Co., 172 N.C. 753 (5c); Ingle v. Power Co.,172 N.C. 754 (1c, 2c); Sparger v. Public-Service Corp., 174 N.C. 777 (6cc);Davis v. R.R., 175 N.C. 652 (3c); Lea v. Utilities Co., 176 N.C. 513
(3c); Lea v. Utilities Co., 178 N.C. 512 (4c); Buffaloe v. Power Co.,180 N.C. 218 (3c); Costin v. Power Co., 181 N.C. 202 (3c); Casada v. Ford,189 N.C. 746 (3c); Inge v. R.R., 192 N.C. 530 (3p); Fleming v. UtilitiesCo., 193 N.C. 264 (1c); Elder v. R.R., 194 N.C. 620 (3j); Redmon v. R.R.,195 N.C. 768 (3c); Newbern v. Leary, 215 N.C. 145, 149 (4c).
(547)