## A. H. COSTIN v. TIDEWATER POWER COMPANY.

### (Filed 6 April, 1921.)

**1. Carriers—Electric Carriers—Negligence—Evidence—Proximate Cause —Public Crossings.**

An electric interurban company for freight and passenger service is required, when its cars approach a public crossing, to give such signal as would be reasonably sufficient to warn persons on the public road of the coming of the car, by ringing the bell or blowing the whistle or both, if necessary; and its failure therein will be evidence of negligence, rendering it liable in damages when the proximate cause of a personal injury to a person attempting to cross the track there.

**2. Same—Obstructions.**

The rule making an electric carrier responsible in damages for an injury caused to one attempting to cross its track at a crossing with a public road, is more insistent where the view of motormen operating the car and also of the person injured was obstructed at the time by a building in the carrier's use and maintained by it on its right of way.

**3. Same—Apparent Danger.**

It is the duty of the motorman on the car of an electric carrier, in the exercise of ordinary care, to avoid a collision by stopping the car in time, when he sees or should have seen that a vehicle at a public crossing has stopped ahead of it on the track, and his negligence therein renders the carrier liable when it is the proximate cause of the injury.

**4. Same—Contributory Negligence—Questions for Jury.**

In an action against a carrier for damages for a personal injury sustained at a public crossing in a collision with defendant carrier's electric

car, there was evidence tending to show that the defendant's motorman, in the exercise of due care, should have seen the automobile in which the plaintiff was a passenger, projecting beyond its building on its right of way in time to have stopped the car and avoided the injury complained of; that he had been signaled in time by a third person present on the occasion; that the automobile had started a short distance from the track after the plaintiff had unavailingly looked and listened, and though he continued to observe this care the train came suddenly in view from behind the building and struck the car in which he was a passenger: *Held*, the questions of defendant's negligence and the plaintiff's contributory negligence were for the determination of the jury upon appropriate issues.

**5. Evidence—Opinion—Nonexperts—Admissions.**

Where the defendant electric carrier by rail has practically admitted by its evidence that by the exercise of ordinary care its motorman could have stopped its car within a certain distance, which would have avoided a collision at a public crossing, the testimony of a nonexpert witness that defendant's car could have done so under the circumstances becomes immaterial.

**6. Evidence—Opinion—Nonexperts—Jury.**

A nonexpert witness may express an opinion, when he knows the conditions, of the distance within which the car of an electric carrier by rail can be stopped to avoid an injury, the subject of the suit; and a jury may, unaided, do so upon the evidence tending to show it.

WALKER, J., dissenting.

APPEAL by defendant from *Daniels, J.,* at the December Term, 1920, of NEW HANOVER.

This is an action to recover for alleged negligence in striking plaintiff while he was in an automobile truck crossing the tracks of the defendant at Seagate (or Greenville Sound) station, and for damage to the truck.

The allegations of negligence are:

1. That defendant had a wooden building or structure on the side of its road near Seagate station to the east of the public road, which he alleges obstructed the view of the cars on the defendant's line coming from Wrightsville Beach to Wilmington to such an extent that persons riding in automobiles were unable to see the cars until they entered upon the track.

2. That as plaintiff entered on the track in an automobile truck he was struck by a street car, and that the conductor was negligent in not keeping a proper lookout, and in not blowing his whistle.

The defendant denied the allegations of the complaint, as alleged, and set up that the plaintiff saw or could have seen the train before attempting to cross the crossing if he had stopped, looked, and listened at the proper place and time, and set up that the plaintiff was guilty of contributory negligence.

The public road crosses the track of the defendant at Seagate almost at a right angle.

On the east of the road and between it and the track there is an ice house or freight station with a platform on the side next to the track.

Mr. Gillette, a witness for the defendant, testified, among other things, as follows: "The freight station is a small enclosure, with a platform. The edge of this house or platform is eighteen feet from the center of the hard-surface road; that is, the western edge. The distance from the northern edge of the platform to the railroad track, the south rail, is six feet. The northern edge of the platform is next to the railroad, and the freight shed is on the south side of the track and on the east side of the county road. The freight station is shown on the map as an ice house. The northern end of that freight station is a platform, a portion of which is enclosed and a portion not enclosed. The unenclosed portion is the north edge of the platform. Half of it, five feet one inch, is not enclosed. From the enclosed portion of that platform to the rail is eleven and a half feet of unobstructed view. The county road coming from the south to the railroad going towards Wilmington has about one per cent down grade towards the track. The platform is three feet ten inches from the ground level to the top of the platform. . . . I should say a person standing at the platform, point 'C,' could see a train coming up the track eastward at least three hundred feet. Standing at 'C' he could see to the point marked 'T-2,' at least three hundred feet. . . . The ice house and platform combined, from north to south, is twenty-eight feet four inches long. The ice house itself is eighteen feet two inches long. . . . If this machine was beyond the platform he could probably be seen as far from a motorman on a car as the car could be seen at least two hundred feet."

The point "C" referred to by the witness is marked on the map introduced by the defendant as ten or eleven feet from the track.

The plaintiff testified in his own behalf as follows: "On 10 August, 1917, my wife and myself boarded the train at Atkinson on our way to Wrightsville Beach. We arrived in Wilmington in time to catch the eleven o'clock car out to the beach. When I purchased my ticket, I purchased a ticket to Seagate only, intending to get off there and go out to a little farm I owned on the turnpike road to the left of the track going toward the beach, and to later join my wife on the beach. The car stopped at Seagate, and I got off on the right-hand side near the little station house. The car passed on, and I noticed, standing in the western edge of the Seagate road, a truck which was about twenty-five or thirty feet, I suppose, from the track on the same side of the track that I got off. This truck was operated by Mr. Ben Harper, who lived with his father out on my place. I inquired for Mr. Harper, didn't see

him around there anywhere, and I was told he was over to a cold drink stand about forty or fifty yards from the station, and I walked over there and spoke to Mr. Harper and asked him if he was going over to my place, and he said that he was. I told him I wanted to go with him, so in a very short time we walked on back toward the station. We were all the while in full view of the track below this building toward the beach down to the creek. There was no car there. No car whistle blew. Didn't hear the roar of any car, so we passed on and just before going behind the building to the truck I again looked, but there was no car there and no car whistle blew. I didn't hear the roar of any car. We walked on to the truck and I spread out a newspaper on the seat to protect my clothes and got up on the seat. Mr. Harper walked around to crank the truck and while he was going around I again looked and listened. There was no car whistle blew, didn't hear the roar of any car, didn't see any car, and he immediately cranked up the truck and we felt it perfectly safe to cross the track. Other people were going and coming and he immediately proceeded to cross the track slowly and in low gear, and just as the front wheels of the car entered the first track I noticed that the truck came to a stop at once, throwing me forward, and I looked up and saw Mr. Harper was busily engaged trying to get the car off the track, and then I immediately looked down the track and saw this car coming from behind the building at a distance of twenty-five feet, running slowly, slightly up grade. It ran on up slowly and bumped our truck suddenly, jarring it forward a distance of two or three feet, and then immediately came against it with tremendous force, everything flying up with a terrible crash, and at this point I was hit in the back. The car hit me in the back, knocking me off into the sand, and I fell into the sand. The truck was then drug ahead of the car a distance of about twenty feet towards Wilmington. The building that stood at the junction between the car line and the Seagate road is a dilapidated look-ing affair, and it has a platform in front of it. The platform stands about twelve inches, I suppose, from the end of the crossties, has an open space over it which readily enabled the motorman on that car, in the elevated position that he was, to see the radiator on that truck at least forty or fifty feet before he reached it, while we were sitting back on the seat of the truck we were not able to see the car until it was within a much closer distance to us."

There was other evidence that the defendant gave no signal or notice of the approach of its car to the crossing, and that the crossing was much used.

G. V. Larsen, a witness for the defendant, testified as follows: "I was at Seagate the date of this accident. I left the house and just as I came out of the door the passenger car was going down. I walked on

down the middle of the road, and just before I got to the station, when I was about a hundred and fifty or a hundred and eighty feet from it, I heard a whistle blow, sound like it was on the other side of Bradley's Creek—a station blow, blowed one time. Didn't blow for any crossing at all, just blowed one time, and I went on a little further and about that time I seen a car come around the curve and Mr. Costin and Mr. Hanby and Mr. Harper was in the car. I hollered to them, but the machine was making a lot of noise, and they didn't hear me. When I hollered the second time they had started off, and I hollered a third time. I hollered the third time, and Mr. Hanby looked around. I threw up my hand to the motorman, and Mr. Hanby rolled off, didn't jump off, but rolled off. The car hit plaintiff's truck just at the windshield, drug him up the road a distance of about twenty feet right at the crossing, drug him a distance of about twenty feet. I didn't see the driver of the truck turn his truck at all. He drove out on the road and started on the track. The car hit him about where the windshield belonged. The driver jumped out of the seat over the door on the left-hand side, and Mr. Costin was mashed down between the steering wheel and the work car. He was not thrown out. Mr. Hanby took him out. I hollered at them three times. I stuck my hand out to the motorman. Nobody paid any attention to me. . . . The motorman didn't seem to pay any attention to me when I waived. He was looking out the door at me and couldn't help but see me. He said he saw me. He did not stop his car until after they hit. I think the street car was going somewhere between eight and ten miles when I first saw it, just as it came around the curve. I couldn't say whether the signal I heard was made by the freight car, it was too far off. It might have been made by a passenger car. It was a station blow. It wasn't a crossing signal. Never heard any signal given for the crossing, horn blown, or bell rung by the street car. . . . I wasn't waiving at the men on the truck. I was waiving at the fellow on the car. When I threw up my hand Mr. Hanby looked around and rolled off the truck. When I waived my hand Mr. Costin and the driver of the truck were not looking in my direction. They were kinder faced away from me. I was at right angles to them. I was in the middle of the track when I threw my hand up, about a hundred and eighty feet from where the crossing was, looking straight down the track to the approaching car. The motorman was standing in the door looking straight down the track toward me. He was looking in my direction when I threw up my hand and hollered.

"Q. I will ask you, Mr. Larsen, if that motorman had applied the brakes to his car at the moment when he saw your signal or the moment you threw up your hand and hollered, if he could have stopped that car before it reached the crossing and struck the truck? A. He could."

Defendant excepted.

The motorman testified that he blew for the crossing, and, among other things: "Just before I got to this little station you could see up and down the road each way, and I looked out and saw that the road was clear each way, and just as I got near the crossing was when I saw Larsen. He threw up his hand, but didn't realize there was anything standing behind the ice house, or anything of the kind behind the station. I shut off my current then, I was going very slow and just about the time that I got to the crossing I saw the truck, and supposed that he saw me. He turned that way, and there was a colored man I had on the line car that was sitting right on the south corner of the line, and when he turned that way he hit just back behind, possibly a foot or two behind where this man was sitting and turned and ran on the side of the road a distance of possibly fifteen or eighteen feet. When I saw the truck I immediately applied the brakes and stopped in fifteen or eighteen feet. I would judge my car was going about possibly ten or twelve miles an hour. Brakes were in good condition. There was nothing I could have done right at that time when I saw this truck coming toward the track. . . . At the time of the accident I was looking out of the window. I saw Mr. Larsen when he threw up his hand. I possibly could have stopped the car at that time before the accident."

The curve referred to by witness Larsen is one hundred and fifty or two hundred feet from the crossing.

There was other evidence sustaining the contentions of the plaintiff and defendant.

At the conclusion of the evidence the defendant moved for judgment of nonsuit upon the ground (1) that there is no evidence of negligence on the part of the defendant; (2) that upon the whole evidence the plaintiff is guilty of contributory negligence. The motion was overruled, and defendant excepted.

The same point is presented by several prayers for instruction.

There was a verdict and judgment in favor of the plaintiff, and the defendant appealed.

*J. H. Stringfield and McClammy & Burgwin for plaintiff.*
*George Rountree and Thomas W. Davis for defendant.*

Allen, J. The exceptions chiefly relied on by the defendant is to the refusal to enter judgment of nonsuit, the defendant insisting that there is no evidence of negligence, and that upon the whole evidence plaintiff was guilty of contributory negligence.

The principles determinative of the questions raised by this exception are so well settled, and they have been discussed so recently in several cases, that it is only necessary to state them.

It was the duty of the defendant as it approached the crossing to give such signal as would be reasonably sufficient to warn persons on the public road, which crossed the track, of the coming of the car by ringing the bell or blowing the whistle, or both if necessary, and the failure to give such signal would be evidence of negligence, and this duty was more insistent because the view of the motorman and of the plaintiff was obstructed by the ice house or freight station.

It was also the duty of the defendant, after the truck stopped on the track, if a collision was probable, to stop its car, if it could do so by the exercise of ordinary care in time to avoid striking the truck.

If it failed to perform either duty it was negligence, and if there is evidence that such failure of duty was the proximate cause of the injury, the action can be maintained. *Bagwell v. R. R.,* 167 N. C., 615; *Norman v. R. R.,* 167 N. C., 533; *Goff v. R. R.,* 179 N. C., 219, and *Perry v. R. R.,* 180 N. C., 290.

Is there evidence that the defendant did not give notice of the approach of the car to the crossing, or that the truck stopped on the track, and that by the exercise of ordinary care the defendant could have discovered the danger of a collision in time to stop and avoid the injury?

The plaintiff testified that as he was approaching the track he was listening, and that he heard no signal from the approaching train, and there was other evidence to the same effect.

He also testified that the truck stopped when it reached the track; that the head of the truck could have been seen by the motorman when he was forty feet from the crossing; that he himself saw the car when it was twenty-five feet from the crossing, and that the truck had then stopped.

The witness Larsen evidently saw that a collision was imminent, because when he saw the truck approaching the crossing and the car coming, he got in the middle of the track, threw up his hands and called out three times to attract the attention of the motorman, and that when he first saw the car and threw up his hand the car was about the curve, one hundred and fifty or two hundred feet from the crossing. He also states that the motorman saw him.

The witness Gillette testified that at a point about eleven feet from the track you could see up the track in the direction the car was coming about two hundred feet.

The motorman testified that when he applied his brakes he stopped the car in eighteen or twenty feet.

Upon this evidence the jury could well find that no signal of the approach to the crossing was given; that the car which was running at eight or ten miles an hour could have been stopped in eighteen or twenty feet; that the motorman was put on notice by Larsen when one

hundred and fifty or two hundred feet away that there was some danger at the crossing; that in any event the motorman could have seen the truck as it approached the crossing when forty feet away, and that he could have seen the truck after it stopped on the track twenty-five feet away, and that the car could have been stopped in eighteen or twenty feet, and if so, there was evidence to support the contention of the plaintiff that the defendant was negligent in failing to give the proper signals, and also that it could have discovered the dangerous position of the plaintiff after the car stopped in time to stop its car and avoid injury to the plaintiff.

It was also a reasonable inference to be drawn from the evidence that if the whistle had been blown it would have been heard and the truck would have stopped before it reached the track of the defendant, and that the real and proximate cause of the injury was the failure to give the signal or the failure to stop after the dangerous position of the plaintiff could have been discovered.

It was also the duty of the plaintiff to exercise ordinary care as he approached the crossing, and to use his sense of sight and hearing to the best of his ability under the surrounding circumstances, but as his view was obstructed by the ice house, which was in part on the right of way of the defendant, and a part of it used by the defendant, if the defendant failed to warn him of the approach of its train and to give the proper signals as its car approached the crossing, and induced by this failure of duty the truck approached the crossing and was struck and the plaintiff injured, he having used his faculties as best he could under the circumstances to ascertain if there was any danger ahead, negligence will not be imputed to him, but to the defendant, the failure to warn him being regarded as the proximate cause of any injury he received. *Johnson v. R. R.*, 163 N. C., 443, approved in *Goff v. R. R.*, 179 N. C., 220.

The plaintiff testified that after he reached Seagate he found a truck standing twenty-three feet from the track, which he recognized as one used on his farm, which was within a short distance of the station; that he inquired for the driver of the truck and found that he was at a cold drink stand about fifty feet from the track; that he went to the drink stand and found the driver, who said he would take him to his farm on the truck; that he then started towards the truck; that upon leaving the cold drink stand he could see down the track towards the branch; that he looked down the track at that time and saw nothing; that as he was going towards the track he looked two or three times and saw no car, nor did he hear any whistle blow; that he got on the truck, but that his view was then obstructed by the ice house; that as the driver walked around to crank the truck he looked and listened, and that he heard no

·car whistle, nor did he hear the roar of the car; that he looked down the track just before going behind the building going to the truck; that the truck started, and it proceeded to cross the track slowly and in low ·gear, and as it reached the track it stopped.

If this evidence is true, and its credibility was for the jury, the plaintiff was doing all that he could under the circumstances for his own safety, and it cannot be declared as matter of law that he was guilty of contributory negligence.

The exception to the expression of opinion by the witness Larsen that if the motorman had applied his brakes to the car at the moment when he saw your signal or the moment you threw up your hand, that the car could have been stopped before it reached the crossing, is without merit.

According to the evidence, the car was one hundred and fifty or two hundred feet from the crossing when Larsen first threw up his hand, and the motorman practically admits that he could at that time have stopped the car in time to avoid the injury, so that the evidence was about a matter that was really not in dispute.

If, however, it was otherwise, it has been held that one who is not ·an·expert and knows of the conditions, may express an opinion of the distance in which a car can be stopped, and indeed that the jury may form its own opinion from the evidence. *Deans v. R. R.,* 107 N. C., ·686.

We have examined the parts of the charge excepted to, and find that they conform to the opinions of this Court.

No error.

WALKER, J., dissenting for the reasons stated in his opinion filed in *Perry v. R. R.,* 180 N. C., 290, at 299, in regard to the duty to stop, look, and listen.